[No. S071835. Jan. 2, 2003.]

In re LARRY H. ROBERTS on Habeas Corpus.

728

**COUNSEL**

Lewis, D'Amato, Brisbois & Bisgaard, Lewis Brisbois Bisgaard & Smith, Claudia J. Robinson; and Robert Bloom for Petitioner Larry H. Roberts.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Ronald A. Bass and Dane R. Gillette, Assistant Attorneys General, Peggy Ruffra, Ronald S. Matthias and Susan Duncan Lee, Deputy Attorneys General, for Respondent the People.

**OPINION**

**MORENO, J.**—Petitioner Larry H. Roberts was sentenced to death for the August 17, 1980, murder with special circumstances of fellow prison inmate

Charles Gardner. We affirmed the judgment on automatic appeal. (*People v. Roberts* (1992) 2 Cal.4th 271 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

On July 7, 1998, petitioner filed the present petition for writ of habeas corpus, raising numerous claims. We issued an order to show cause why relief should not be granted on the grounds that the prosecutor knowingly offered perjured testimony and that petitioner was denied effective assistance of counsel because his trial counsel failed to properly impeach prosecution witnesses with evidence that a prison gate, through which petitioner allegedly had passed after the murder, had been locked. After receiving respondent's return, we appointed a referee to conduct an evidentiary hearing. As explained more fully below, the referee found that three prosecution witnesses testified falsely at trial, but the prosecution did not attempt to induce this false testimony and defense counsel was not ineffective in failing to present exculpatory evidence regarding the prison gate.

After considering the record on appeal, the evidence presented at the habeas corpus evidentiary hearing, and the findings of the referee, we deny the petition for writ of habeas corpus.

FACTS

1. *The Trial*

Following a jury trial, petitioner was convicted of the first degree murders (Pen. Code, § 187)[1] of Gardner and Albert Patch, a correctional officer at California Medical Facility, Vacaville, where petitioner and Gardner were inmates, with the special circumstances that petitioner previously had been convicted of first degree murder (§ 190.2, subd. (a)(2)), that he had committed multiple murders (§ 190.2, subd. (a)(3)), and that he had killed Gardner by means of lying in wait (§ 190.2, subd. (a)(15)). Petitioner also was convicted of conspiracy to commit murder (§ 182), assault by a life prisoner resulting in death (§ 4500), and possession of a weapon by an inmate (§ 4502). He was sentenced to death for murdering Gardner and violating section 4500, and to life imprisonment without possibility of parole for murdering Patch. On appeal, we reversed petitioner's conviction for the murder of Patch and set aside the multiple-murder special circumstance, but otherwise affirmed the judgment. (*People v. Roberts, supra,* 2 Cal.4th 271, 294.)

The evidence admitted at trial showed that on August 17, 1980, Gardner was stabbed repeatedly as he walked down a prison corridor. The prosecution sought to prove petitioner killed Gardner as part of a gang dispute. It

---

[1]All further statutory references are to the Penal Code, unless otherwise noted.

offered evidence to support two scenarios: that petitioner and fellow inmate Archie Menefield killed Gardner as part of a conflict among members of the Black Guerrilla Family (BGF), a prison gang, or that petitioner stabbed Gardner because Gardner had insulted him in the prison yard.

Inmate Raybon Long, a BGF member, testified that petitioner was a lieutenant in the BGF and Ruben Williams was the leader. Williams had disputes with many BGF members, including petitioner, over administration of the gang's Vacaville chapter. Long overheard petitioner tell Williams to surrender control of the BGF at Vacaville. Williams refused. Later, a day before Gardner's killing, he again heard petitioner, in front of Menefield and Gardner, order Williams to surrender authority, threatening to kill him if he did not. Petitioner also threatened Gardner, who sided with Williams, saying: "Well, if you gonna ride with him, you gonna die with him."

Another inmate, Leslie H. Rooks, testified for the prosecution that the day before the killings Gardner had cursed petitioner. Petitioner reacted angrily, and asked Rooks for a knife, telling him that he was going to kill Gardner. Petitioner also told Rooks that he was going to kill Williams because he was mishandling his command of the Vacaville BGF. Rooks testified that petitioner was carrying a knife on the morning of the killings.

Early on the morning of the killings, inmate Robert Hayes was working with petitioner in the prison's medical clinic. Petitioner asked Hayes whether alcohol could remove fingerprints and if another disinfectant would remove blood. Petitioner tried to telephone Menefield from the clinic, but was told that he would not be released from his cell until 7:30 a.m. Petitioner examined an Ace bandage, said it was unsuitable, and asked if there was any paper tape—a type of white tape thinner than adhesive tape and easier to remove. When Hayes looked in the clinic's back room, petitioner was using the tape to wrap a prison-made knife. Hayes told petitioner that he thought he had settled his accounts with Gardner, but petitioner replied, "I can't let that punk get away with this disrespecting me," or similar words. Petitioner then left the clinic.

Long testified that, on the morning of the killings, petitioner roused Menefield from bed and told him to hurry up because Williams was on the first floor. He also asked for someone to collect the knives after they were done with the killing. Petitioner and Menefield then left to go to the first floor.

Long, Hayes, and inmate Ryland T. Cade testified that they saw petitioner stab Gardner with a prison-made "shank" or knife as Gardner walked down

the corridor on the first floor. When Gardner tried to fight back, Menefield grabbed Gardner and held him down so that petitioner could continue to stab him. Petitioner then dropped the knife and ran upstairs, followed by Menefield.

Rooks was on the third floor when the alarm sounded following the stabbings. He obtained permission to go to petitioner's cell and found him there, dressed in his underwear and possibly a bathrobe. The prosecution introduced evidence in rebuttal "that an agile person could run from the first floor to certain key locations in seconds and walk briskly to [petitioner]'s cell in less than one minute, and that [petitioner] could have done so unseen." (*People v. Roberts, supra,* 2 Cal.4th 271, 296.)

After the incident, Cade and petitioner were both confined in the segregation wing. Cade had been sent there for fighting with another inmate and petitioner was being held as a suspect in the killing. Petitioner told Cade that he had stabbed Gardner and then had run to the third floor. Petitioner said that he murdered Gardner because of Gardner's desire to leave the BGF and because he believed Gardner might kill another inmate, Donald Hand.

Inmate Richard Yacotis testified that he too had been confined in the segregation wing with petitioner and Menefield after the killings. Menefield stopped by petitioner's cell on his way back from a shower, and the two discussed the crimes. Yacotis watched, using a mirror, and was close enough to overhear the conversation. Petitioner asked Menefield, "Why didn't you pick up the knife?" Menefield replied, "Because I was running right behind you up the stairs." Then Menefield added, "If push comes to shove, I will take the rap."

Not all of the evidence pointed to petitioner's guilt. Inmate David Calvin, Jr., although a prosecution witness, testified he saw Menefield stab Gardner. A second inmate, whom Calvin could not identify, made stabbing motions toward Gardner during the attack, but Calvin stated that petitioner had left the area before the stabbing began. Inmate Norman Goodwin also testified for the prosecution that Menefield stabbed Gardner.

Petitioner sought to discredit the testimony of Cade, Long, Rooks, Yacotis, and Hayes, noting they had a motive to lie because they had received benefits from the state, and they had been housed together at the state prison in Chino, but each witness denied that he had discussed his testimony with the others. On cross-examination, Cade admitted that he had lied at the preliminary hearing to avoid revealing Long's presence on the first floor. He admitted not telling the whole truth in early interviews with investigators,

stating that, for reasons of safety, he wanted to tell them little and be left alone. And he admitted disliking and being contemptuous of petitioner.

Cade conceded that he had asked for an accelerated parole date and was told that the request could not be honored. He received $40 from the state. But he denied having received any other favors.

Yacotis stated on cross-examination that he had overheard Long tell Calvin that the two had to get their stories straight in order to obtain their freedom, and that Long and Calvin had discussed, in counsel's words, " how they were going to send some other inmates to the gas chamber."

Inmate Arthur Gibens (spelled "Givens" at the reference hearing ) testified for the defense that prior to trial, Long told him "[t]hat he really didn't know what had happened and he had been recruited to say certain things . . . ." Long also said that he had not been present when the stabbing occurred.

Long acknowledged on direct examination that he might later receive a reduced sentence in exchange for his testimony. He also testified that the prosecution's investigator had paid $30 to $40 into his prison account to compensate him for money lost while he was in protective custody and, hence, unable to work. And he was given a choice of facilities, albeit limited, in which to remain incarcerated, evidently for his safety.

Long admitted on cross-examination that he lied at the preliminary hearing when he testified that he did not see petitioner run to the third floor. And he was impeached on discrepancies between various details of his preliminary hearing testimony (and prior statements to investigators) and his testimony at trial.

Rooks acknowledged that the prosecution had written a letter to the parole board on his behalf, paid $30 into his trust account, and taken steps to ensure his safety. Rooks misbehaved while at the state prison in Chino and wrote a letter to the prosecutor, Charles Kirk, demanding relief and threatening not to testify in petitioner's case if his demand was not met. Kirk went to Chino and discussed the matter with officials, but sided with them; as a result, Rooks was confined under harsher conditions. Called on rebuttal, Rooks stated he was testifying against petitioner because petitioner had issued an order to have Rooks killed.

Hayes stated that he had testified falsely at the preliminary hearing about his interactions with petitioner in the medical clinic and had falsely stated that he did not see petitioner stab Gardner. At the time of the preliminary

hearing, Hayes was on parole, but he was back in prison at the time of trial. He explained that he wanted to avoid involvement in the incident at the time of the hearing because he had just been paroled and was afraid of the BGF, but that he later changed his mind because he had problems outside the prison with the BGF; namely, that he was believed to have broken the convict's code of silence by testifying at the hearing.

## 2. *The Petition and Its Exhibits*

In 1995, Long recanted important parts of his testimony, asserting that petitioner did not stab Gardner and he was never aware of any plan to kill Williams or Gardner. Long also changed his testimony that petitioner had threatened Gardner the day before Gardner was killed, stating instead that it was Gardner who had threatened to kill petitioner. According to Long, Hayes did not witness and could not have witnessed the stabbing and had said, while imprisoned in Chino, that he was going to lie that he had witnessed the stabbing in exchange for benefits.

Long further declared: "I lied on the witness stand at the trial about nearly everything I testified to regarding Larry Roberts. The prosecution's investigators who questioned me made it clear to me that Roberts and Menefield were their targets and that they wanted me to say that Roberts wanted to kill Gardner and Ruben Williams, that he stabbed Gardner, and that he ran to the third floor. That is eventually what I testified to, and it was false." He testified falsely against petitioner not only to please the authorities but also because he had heard a rumor that petitioner had ordered him to be killed, which made him angry. He, Calvin, Rooks, Hayes, and Cade were imprisoned together after the crimes, spoke constantly about the crimes, and were encouraged by the prosecution to coach each other "to 'get the story straight,' and we did try to do that. But the story was so basically untrue that we had a difficult time getting the facts together." He and other witnesses received monetary and other benefits for their favorable testimony. In sum, Long declared that "I lied under oath. Cade lied. Hayes lied. We were all rewarded for our lies. . . . I have lived with this shame for 15 years and I am happy to get this off my chest . . . ."

In 1999, however, Long recanted parts of his 1995 declaration. In an affidavit executed following a meeting at the California Training Facility at Soledad with prosecutors and other state officials, Long declared: "What I said during the course of my testimony during the trial was the truth. Larry Roberts stabbed Charles Gardner." He stated that he lied in his 1995 declaration because one of petitioner's counsel in the present proceeding, Robert Bloom, left him with the "impression" in 1995 that petitioner had been removed from the condemned row at San Quentin State Prison. "If Roberts was off death row, I believed . . . my life was in danger. I believed

that I could protect my life by signing a declaration saying that I was forced to lie at Roberts's trial."

Yacotis also recanted important parts of his testimony. On March 10, 1995, at Folsom State Prison, he signed a declaration in which he averred that in 1982 he was incarcerated in Chino along with Long and Calvin. Long told him the prosecution was going to give him $2,000, a new identity, and dental work, and that he expected to be released from prison two weeks after he testified at petitioner's trial. Long also said that he would "do anything to get out of prison." And Calvin told Yacotis that "Long had agreed with the Attorney General to be a prosecution witness if he could get the same deal (release from prison, money, a new identity) as Calvin."

Yacotis stated that the defense had subpoenaed him to testify at trial after he sent them a letter that described plotting by Calvin to frame petitioner. As Yacotis was waiting to testify, he spoke to Prosecutor Kirk, investigators Lieutenant Thomas Hartman of the California Department of Corrections, and William Bennett, supervising investigator for the California Department of Justice. According to Yacotis, Bennett or Hartman told Yacotis: " 'We can make it easy for you or hard for you.' They told me they wanted to 'flip' me (influence me to become a prosecution witness). [¶] . . . Kirk told me that if I testified for the defense, 'You're going to let [Roberts] get away with' Patch's murder. [¶] During this interview Kirk, Bennett, and Hartman asked me to testify that . . . when I was in [the segregation wing] in 1981 . . . I overheard Roberts say to Menefield, 'Why didn't you pick up the knife?' This was false, and I made it clear to them that it was false, but they did not care." He did this because he was young and scared. He refused to speak to petitioner's counsel and instead was called as a prosecution witness "to give the false testimony regarding . . . the knife. . . . In fact, Roberts never once spoke about the case in my presence in [the segregation wing], and I told this to the prosecution team." Moreover, because they were suspected crime partners, petitioner and Menefield were not even on the same floor in the segregation wing.

Rooks also recanted his testimony in significant part. He executed a declaration on March 16, 1995, at Mule Creek State Prison. He averred that he never saw petitioner with a knife on the day of the killings or the night before; he was talking with petitioner on the third floor at the moment the alarm sounded; and petitioner did ask him for a knife the day before the killings, telling him that Gardner had threatened him, but Rooks did not give him one, nor did Rooks witness any argument between Gardner and petitioner the day before the killings. He did not aver that the prosecution knew

that his testimony was false, or that investigators or prosecutors coerced him into testifying.

Another inmate, George Frederick Payne, supplied petitioner with an affidavit from prison on February 24, 1995. He averred that soon after the killings he was interviewed by prison investigators. "I specifically recall that Officer Horton was encouraging me to lie about having seen Larry Roberts run up the stairs to the third floor. I did not see Roberts at all that morning . . . . Horton told me that '. . . if you saw Zoom [petitioner] running up the stairs, it will be beneficial to you.' [¶] Horton also wanted me to say that Roberts and Gardner were involved in an ongoing argument. I was not aware of any such argument, and I told this to Horton."

Payne also averred: "Mr. Kirk tried to get me to testify that I saw Roberts running up the stairs. When I told Mr. Kirk that I had not seen Roberts, he continued to try. Mr. Kirk did not specify just what he would do for me, but he made it clear that he would do something to help me."

3. *The Reference Hearing and the Referee's Findings*

On August 18, 1999, we issued an order to show cause "why the relief prayed for should not be granted on the ground that (1) the prosecutor knowingly offered perjured testimony by other inmates against petitioner; or (2) petitioner was denied the effective assistance of counsel when counsel failed to impeach prosecution witnesses with evidence from Peter DuQuesnay [a prison guard] that the east grille gate to the third floor at the California Medical Facility, Vacaville, was kept locked at all times; or on both grounds."

On March 16, 2000, we directed the referee to conduct an evidentiary hearing to make findings on several enumerated questions.[2] The reference hearing was held before Solano County Superior Court Judge Franklin R. Taft.

---

[2]We directed the referee to make findings on the following questions:

"1.   What, if any, testimony did the prosecutor at petitioner's trial induce, or attempt to induce, from inmate witnesses? And if any, from which inmates? Did the inmate witnesses discuss their testimony among themselves before trial? Did the inmate witnesses' trial testimony vary from what they actually saw or heard? And specifically in addition (but without necessarily limiting the findings of fact to answering the following questions):

"a.   Did Raybon Long hear petitioner discuss Gardner's stabbing before it occurred? Did Long see petitioner stab Gardner? Did Long see petitioner run to the third floor after stabbing Gardner?

"b.   Did Richard Yacotis hear petitioner discussing the stabbing afterward? What is the truth of the claims made in Yacotis's purported August 12, 1982, letter to defense counsel?

"c.   Did the trial testimony of Ryland T. Cade, Robert Hayes, or David Calvin, Jr., vary from what they actually saw or heard?

Long, who testified at trial that he saw petitioner stab Gardner, but later recanted that testimony, and then recanted his recantation, was called as petitioner's witness but stated that, affected by the illicit use of drugs, he remembered little of what had happened 20 years before. On the advice of his counsel, he invoked the privilege against self-incrimination and did not testify.

Cade reaffirmed his trial testimony that he saw petitioner stab Gardner. He acknowledged that he, Long and Hayes had discussed the case before trial when they were incarcerated in the same unit, but denied they had "compared stories." Rather, Cade stated they all were nervous and reluctant to testify and just gave each other "moral support."

Yacotis, who testified at trial that, after the crimes, he heard petitioner discuss the killings with Menefield, but later recanted that testimony, stood by his recantation, testifying that Long and the other inmate witnesses conspired to win benefits for themselves in exchange for false testimony at petitioner's trial and reasserting that the prosecutor and his investigators had exhorted him to testify falsely at trial. Yacotis stated that the conversation he described at trial between petitioner and Menefield in the segregation unit in 1980, in which one asked the other, "Why didn't you pick up the knife?" never occurred. Yacotis reiterated that petitioner and Menefield were not housed near each other in the segregation wing.

Ruben Lavert Howard, an inmate at the Chino state prison, testified at the reference hearing that he had heard Long, Rooks, and Calvin discuss petitioner's case. Regarding the stabbings, "one of them said that Larry didn't do it, but he was in the hallway and another guy said something about, 'I'm going to try to get a date out of it,' " meaning a parole date. "They . . . said that Larry was in the hallway and that he didn't have nothing to do with the actual . . . crime . . . ."

Howard testified that Rooks, Calvin, and Long all said petitioner did not commit the crime and was being framed. Long later repeated that assertion.

"d. Did Leslie H. Rooks see petitioner carrying a knife just before the stabbing? After the stabbing, when and where did Rooks first see petitioner?

"e. Were attempts made to persuade George Frederick Payne to testify falsely at the trial?

"2. What evidence was available to defense counsel that the east grille gate on the third floor at the California Medical Facility, Vacaville, was locked or open at the time of the stabbing? What additional evidence, if any, would further investigation have produced on this point? What circumstances would have weighed against investigating the existence of or presenting any such evidence? What evidence rebutting any such evidence would have been available to the prosecution following its own investigation? Was the east grille gate open or locked at the time of the stabbing? If it was locked, could plaintiff nonetheless have gone up the stairs and to his cell immediately after the stabbing?"

Howard further testified that he alerted his or petitioner's family to the conspirators' plans and asked them to tell the defense lawyers, but nothing happened as a result of whatever efforts, if any, they undertook.

Arthur Givens (spelled "Gibens" at trial) testified that at Chino, Long told him some people were trying to align their story about the Gardner stabbing to win release from prison, and he was scared the jury would find out they were lying.

Calvin reaffirmed his trial testimony that he saw Menefield and another unidentified prisoner, but not petitioner, stab Gardner. He also testified that after the incident, he was in a segregation wing cell adjoining petitioner's cell for six months, and petitioner never discussed the incident there. Calvin testified that he was doing "short time" at the time of the stabbings—he was due for parole in one and one-half years—so the investigators had little to offer him as an inducement in exchange for his testimony.

As regards prosecutorial misconduct, Payne testified that Horton told him that it would be worthwhile monetarily if he would testify petitioner ran to the third floor. Similarly, Kirk offered Payne money to testify that he saw petitioner and Menefield running up the stairs and down the hall. Payne refused. Payne further testified that the third floor grille gate was "mostly locked," but added that he "rarely went up to the third floor." On cross-examination, Payne stated that Kirk may not have explicitly offered him money for his testimony, but offered him some type of assistance or benefit in exchange for his testimony.

The referee found "[t]here was no believable evidence that there was an attempt by Kirk or the investigators to induce false testimony" and "that defense counsel did not overlook any potential evidence that would have tended to show that the grille gate was locked at the time of the stabbings." The referee further found "that the third floor east grille gate was in fact open at the time of the stabbings." Petitioner excepts to these findings.

The referee found that Long, Rooks, and Calvin had discussed the case while housed together in Chino, but concluded that Rooks and Calvin had not fabricated their trial testimony. With reference to Long, the referee stated that "[b]ased on the conflicting 1995 and 1999 declarations" and the circumstances that Long "was given money and better prison housing, with representations that Kirk would appear at his parole hearing with favorable recommendations," "your Referee can only find that Long's trial testimony should not be treated as believable."

The referee found Yacotis's testimony recanting his trial testimony "believable," stating: "The Referee is aware that recantations should be viewed

with suspicion. However, Yacotis had served his time and had been released. He believed that should he ever find himself back in prison, his recantation of the trial testimony would cause difficulty with the authorities. He appeared to the Referee to be sincere. He had nothing to gain by recanting the trial testimony." The referee found specifically that "Yacotis did not overhear the conversation between Petitioner and Menefield."

The referee acknowledged that "Cade's general account of the stabbing itself remained consistent although it varied from time to time regarding details of where Cade and other witnesses were located at the time of the stabbing." The referee further found, however, that "Cade's testimony at the Reference hearing was evasive and often at variance with prior testimony" and noted that this court had concluded in the automatic appeal "that Cade's trial testimony was thoroughly impeached." The referee stated: "From the above, the Referee finds that Cade's trial testimony was not truthful and varied from what he actually heard or saw."

The referee noted that "Hayes is reported to be deceased and did not testify" at the reference hearing. The referee found that nothing was presented "that would indicate that Hayes' trial testimony was false." Petitioner excepts to this finding. Similarly, the referee found that "[n]othing was presented at the Reference hearing to suggest that Calvin's testimony varied from what he saw or heard . . . ." The referee also found the trial testimony of Rooks "to be credible." Petitioner excepts to this finding.

DISCUSSION

*Presentation of Evidence Known to Be Perjured*

█ "A judgment of conviction based on testimony known by representatives of the state to be perjured deprives the defendant of due process of law [citations] and may be attacked on habeas corpus [citations]. In making such an attack, however, petitioner must establish by a preponderance of the evidence that perjured testimony was adduced at his trial, that representatives of the state knew that it was perjured [citations], and that such testimony may have affected the outcome of the trial [citations]." (*In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].)

"We emphasize that, because petitioner seeks to overturn a final judgment in a collateral attack, he bears the burden of proof. [Citation.] ' "For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal

proceedings so demands . . . ." ' [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

In the present case, the referee found that "[t]here was no believable evidence that there was an attempt by Kirk or the investigators to induce false testimony." Petitioner excepts to this finding. " 'The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying.' [Citations.]" (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466].) For the reasons that follow, we adopt the referee's finding and conclude that petitioner has failed to show the prosecution knowingly presented perjured testimony.

The referee found that the inmate witnesses expected and received some favorable treatment as a result of testifying for the prosecution. They were transferred to a prison facility that they preferred and were given small amounts of money. Yet the referee found, and the record before us supports the conclusion, that the prosecution did not promise the inmates specific rewards in exchange for testifying and the small amounts of money that were deposited into their prison accounts only recompensed them for the amounts they lost while they were in protective custody and hence were unable to work.

Although the referee concluded that three prosecution witnesses (Long, Yacotis, and Cade) gave false testimony at trial, the referee did not find that the prosecution knowingly presented false evidence. We agree. Although, as explained below, we do not adopt all of the referee's findings that prosecution witnesses testified falsely, we agree that petitioner has failed to show that the prosecution knowingly presented false evidence.

*False Testimony*

Following the reference hearing, petitioner argued for the first time that his conviction should be reversed because it was based upon false testimony. The Attorney General objects, asserting that the petition did not allege such a claim, no order to show cause issued on that claim, and granting relief on this claim would deprive the Attorney General of the right to file a return. We need not decide this point, because we find petitioner's claim lacks merit.

Section 1473, subdivision (b)(1) provides that a writ of habeas corpus may be prosecuted if "[f]alse evidence that is substantially material

or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration . . . ." False evidence is "substantially material or probative" (*ibid.*) "if there is a 'reasonable probability' that, had it not been introduced, the result would have been different. [Citation.]" (*In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527].) The requisite "reasonable probability" is a chance great enough, under the totality of the circumstances, to undermine our confidence in the outcome. (*Ibid.*) The petitioner is not required to show that the prosecution knew or should have known that the testimony was false. (§ 1473, subd. (c); *People v. Marshall* (1996) 13 Cal.4th 799, 830 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

The referee found that Long's trial testimony that he saw petitioner stab Gardner "should not be treated as believable." The Attorney General excepts to this finding. This finding is not entitled to the "great weight" usually accorded to a referee's findings of fact, because Long invoked his privilege against self-incrimination and did not testify at the reference hearing. As noted above, " '[t]he deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying.' [Citations.]" (*In re Hitchings, supra,* 6 Cal.4th 97, 109.) The referee had little opportunity to observe Long's demeanor and manner of testifying. Rather, the referee's conclusion that Long's trial testimony should not be believed was based upon Long's conflicting declarations and the inducements provided by the prosecution.[3] We are in as good a position as the referee to assess the effect of these factors, and we reach a different conclusion.

It has long been recognized that "the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722 [114 Cal.Rptr. 429, 523 P.2d 229]; see also *People v. Minnick* (1989) 214 Cal.App.3d 1478, 1481 [263 Cal.Rptr. 316]; *People v. McGaughran* (1961) 197 Cal.App.2d 6, 17 [17 Cal.Rptr. 121] ["It has been repeatedly held that where a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit . . . ."].) It is true that Long's inconsistent

---

[3]The dissent counters that although the referee did not hear Long testify, he did hear the testimony of inmates Howard, Givens, and Yacotis. (Dis. opn., *post,* at pp. 750-751.) That is true, but the jury that found petitioner guilty also had heard the testimony of Givens and Yacotis. Givens testified at trial, as he did at the reference hearing, that Long stated he was not present at the stabbing. Yacotis testified at both the trial and the reference hearing that he overheard Long tell Calvin they had to "get their stories straight" so they could obtain their freedom by sending "some other inmates to the gas chamber." Howard did not testify at trial, but his testimony at the reference hearing that he heard Long state that petitioner had nothing to do with the stabbing was cumulative to the testimony of Givens and Yacotis.

statements lessen his credibility. (*People v. Smallwood* (1986) 42 Cal.3d 415, 431, fn. 10 [228 Cal.Rptr. 913, 722 P.2d 197] ["Even if the recantation of the trial testimony was not reliable, these events cast some doubt on the credibility of Spencer as a witness."].) Because Long has made inconsistent declarations, it is clear that he has lied at some point. It is not clear, however, that it was Long's trial testimony that was false, rather than his initial recantation. We will not disturb the jury's verdict based upon a recantation that must be viewed with suspicion and was subsequently disavowed by Long.

As to the inducements provided by the prosecution upon which the referee relied, these matters were presented to the jury, which convicted petitioner nonetheless.

■ Prosecution witness Yacotis also recanted portions of his trial testimony. As noted above, Yacotis testified at trial that he had been confined in the segregation wing with petitioner and Menefield after the killings and overheard petitioner and Menefield discuss the murder. Yacotis recanted part of his testimony in a 1995 declaration and in his testimony at the reference hearing, denying that he overheard such a conversation and further denying that he had been housed in the same segregation unit with petitioner and Menefield. Prison records showed, however, that Yacotis had been housed in the same segregation unit within six cells of petitioner and Menefield for a period of three days. Despite these prison records, and the referee's acknowledgement that recantations should be viewed with suspicion, the referee found Yacotis's testimony at the reference hearing "to be believable." This finding is entitled to great deference but, even if believed, Yacotis's recantation does not warrant relief on habeas corpus because it does not undermine our confidence in the judgment of conviction.

Yacotis was not an eyewitness to the murder. Rather, he testified that he later overheard petitioner and Menefield discuss the crime. Had this evidence not been admitted, the jury still would have heard the testimony of Long, Hayes, and Cade that they saw petitioner stab Gardner, and Cade's further testimony that petitioner later confessed to the murder. Yacotis's recantation of portions of his testimony does not undermine our confidence in the judgment of conviction. (*In re Sassounian, supra,* 9 Cal.4th 535, 546.)

■ As noted above, Cade testified that he saw petitioner stab Gardner and that petitioner later admitted that he killed Gardner. The referee found that Cade's trial testimony "was not truthful and varied from what he actually heard or saw." In making this finding, the referee was responding to a question posed by this court: "Did the trial testimony of Ryland T. Cade,

Robert Hayes, or David Calvin, Jr., vary from what they actually saw or heard?" Under the circumstances, however, the answer to this inquiry is irrelevant.

The referee's finding was not based upon new evidence that had not been presented to the jury, but upon Cade's demeanor while testifying at the reference hearing and essentially repeating his trial testimony.[4] It is not the function of a referee or an appellate court to reweigh credibility determinations made by the jury. It is true that the referee observed Cade's demeanor while testifying at the reference hearing, but the jury already had observed Cade's demeanor when he testified at trial. The jury was in the best position to determine the truthfulness of Cade's trial testimony.

The referee also relied upon the circumstance that Cade's testimony had been impeached at trial. Again, this finding was not based upon new evidence that had not been presented to the jury. To the contrary, we noted on the automatic appeal that Cade's trial testimony had been "impeached thoroughly." (*People v. Roberts, supra,* 2 Cal.4th 271, 302.) The jury had heard this impeachment evidence and convicted defendant nonetheless. The circumstance that Cade's testimony had been impeached at trial does not cause us to question the validity of the jury's verdict.

Further, the referee found only that "Cade's trial testimony was not truthful and varied from what he actually heard or saw" and did not specify in what respect Cade's testimony was untruthful. The referee's finding that Cade's trial testimony was not truthful, therefore, does not undermine our confidence in the judgment of conviction. (*In re Sassounian, supra,* 9 Cal.4th 535, 546.)

Despite the findings of the referee, petitioner is not entitled to relief based upon the claim that his conviction is based upon false testimony.

### Ineffective Assistance of Counsel

■ "To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation

---

[4]The dissent argues that the referee was in a better position than the jury to evaluate Cade's credibility because certain of Cade's psychiatric and medical records were supplied for the first time at the reference hearing. (Dis. opn., *post,* at p. 751.) The referee, however, gave little weight to these records and the expert testimony based upon them. The referee found that Dr. Tucker, the psychiatrist who testified at the reference hearing, "could not draw any conclusions . . . , twenty years after the fact, as to Cade's ability to perceive, recall or relate at the time of the stabbing or the time of the trial. Any finding by the Referee as to Cade's mental condition at the time of the event or at the time of trial would at best be idle speculation."

fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*In re Resendiz* (2001) 25 Cal.4th 230, 239 [105 Cal.Rptr.2d 431, 19 P.3d 1171].)

Petitioner claims that he received ineffective assistance of counsel because his trial counsel, Richard C. Urquhart, failed to impeach Officer Peter DuQuesnay with DuQuesnay's earlier statement, made to a defense investigator, that the third floor east grille gate was kept locked.

Gardner was stabbed on the first floor. As noted above, petitioner sought to prove he was on the third floor when Gardner was stabbed and introduced alibi evidence at trial that he was seen on the third floor shortly after the stabbing. The prosecution introduced evidence that petitioner could have run from the first floor to his cell on the third in less than one minute. In order to do so, however, petitioner would have had to pass through the third floor east grille gate. Petitioner asserted it would not have been possible for him to pass through the gate because it was locked.

DuQuesnay, a correctional officer on the date of the killings, testified for the prosecution at trial that when the alarm sounded he locked up the prisoners in his charge, which took some time, headed for the third floor east grille gate, and found it locked. He could not remember whether that gate was unlocked when the alarm sounded. He recalled that Officer Rudolph was in charge of the third floor east grille gate.

Rudolph testified that he was going back and forth from the corridor leading to the third floor east grille gate to another wing of the prison on the morning of the stabbings. He was standing in the corridor when the alarm sounded, but he could not remember how long he had been there. Nor did he remember whether he locked the gate before running to the second floor in response to the alarm. Rudolph further testified that, prior to the stabbings, the gate was not always monitored and usually was unlocked.

In his petition for writ of habeas corpus, petitioner alleged that on July 9, 1982, four months before DuQuesnay testified at trial, Danny Clark, a defense investigator, interviewed DuQuesnay and typed a report saying DuQuesnay told him "the grill gate at the top of the stairs was kept closed and locked . . . . He states that the procedure was for the officer to unlock the gate if anyone came up and then to relock it. If the officer happened to be back inside one of the wings at the time someone came to the gate they would just have to wait to be let on the . . . third floor corridor."

Urquhart declared that he was unaware of the contents of Clark's interview of DuQuesnay at the time DuQuesnay testified at trial. Urquhart stated: "I would definitely have cross-examined DuQuesnay using this prior statement to Clark had I been aware of the statement. The locked condition of the East gate was the most important fact in the entire case."

On February 16, 1996, petitioner's counsel, Robert Bloom, and an investigator, Robert Buechler, visited DuQuesnay, by then a lieutenant in the corrections corps, at the California Training Facility at Soledad. DuQuesnay agreed to talk with them, and Bloom showed DuQuesnay Clark's July 9, 1982, report. Bloom declared: "Lt. DuQuesnay took a few minutes to read the Clark report, and then spontaneously said that the report was accurate. . . . [I]t also accurately reflected his independent recollection of the events that took place the day Officer Patch and inmate Gardner were killed. He specifically remembered that the East Gate on the third floor of Vacaville prison was kept locked at all times and that a person without a key . . . would have to wait for an officer with a key to unlock the gate in order to pass through that gate."

DuQuesnay testified at the reference hearing and stated he did not recall much about his conversation with Bloom. DuQuesnay testified that although the *procedure* was to keep the east grille gate locked, that policy was often honored in the breach—the gate would be left open and unmonitored, against the rules. Inmate witness David Calvin, Jr., testified to the same effect. So did Donald Maurice Glenn, who was a correctional sergeant at the California Medical Facility at Vacaville at the time of the incident, and Gloria Manuel, a retired correctional lieutenant at the time of the reference hearing, who was stationed at Vacaville in 1980. Even Clark, petitioner's pretrial investigator and a lawyer in the Contra Costa County Public Defender's Office at the time of the reference hearing, agreed on cross-examination that DuQuesnay was commenting only on procedure, not whether the third floor grille gate actually was locked when Gardner was killed. The referee so found: "the east grille gates, including the third floor east grille gate, were often left open and unattended, especially when the institution was running programs such as meals, yard release, and Sunday morning church services." The killings occurred on a Sunday morning. "The Referee further finds that the third floor east grille gate was in fact open at the time of the stabbings."

As concerns the question of ineffective assistance of counsel, the referee found: "It is clear from this evidence that further investigation . . . would only have disclosed more evidence that (1) enforcement of the third floor east grille gate procedure was notably lax at the time of the stabbing; (2) [California Medical facility, Vacaville] administrators attributed the circumstances leading up to the stabbings in part to lax security procedures and

thereafter took measures to tighten up the procedures; and (3) it was possible that the second perpetrator could pass through that gate unnoticed immediately after the stabbings." Petitioner excepted to portions of this finding.

Substantial evidence supports the referee's findings, and we adopt them. There is no reasonable probability that the outcome would have differed, with regard either to guilt or to penalty, had petitioner's counsel discovered Clark's report and cross-examined DuQuesnay further. There was no ineffective assistance of counsel.

### CONCLUSION

The petition for writ of habeas corpus is denied.

Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.**—I dissent.

Unlike the majority, I would adopt the referee's findings that inmate witnesses Raybon Long, Ryland Cade, and Rick Yacotis gave false testimony against petitioner at his capital trial, claiming that they saw petitioner stab inmate Charles Gardner or heard petitioner confess to the stabbing. (*People v. Roberts* (1992) 2 Cal.4th 271, 295 [6 Cal.Rptr.2d 276, 826 P.2d 274].) The referee's findings are supported by substantial evidence and therefore entitled to great weight. Without the false testimony, there is a reasonable probability the jury would not have convicted petitioner of Gardner's killing. (*In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527].) I would therefore grant the petition for writ of habeas corpus.

### I. BACKGROUND

On the morning of August 17, 1980, as Charles Gardner, an inmate at the California Medical Facility in Vacaville, was walking down a hallway lined with other inmates, he was attacked and repeatedly stabbed. Gardner retrieved a prison-made knife dropped on the floor and pursued two inmates who had fled up a stairway. Grievously wounded, Gardner reached the second floor where, before he collapsed and died, he fatally stabbed a guard, Albert Patch. Shortly thereafter, guards apprehended petitioner in his third floor cell and seized another inmate, Archie Menefield, just as he reached the third floor.

Petitioner and Menefield were tried jointly. At trial, various inmates testified that petitioner harbored ill feelings toward Gardner, stemming

either from a recent incident in which Gardner insulted petitioner or from a power struggle within the Black Guerilla Family, a prison gang. Five eyewitnesses to the stabbing testified at trial. Inmate witnesses Long and Cade testified that petitioner was armed and waiting in the corridor, that he stabbed Gardner and then ran up the stairs. Inmates Cade and Yacotis testified that after the stabbing, while each was in a segregation unit near petitioner and Menefield, they heard petitioner admit to stabbing Gardner.

Petitioner was found guilty and sentenced to death for the first degree murders of Officer Patch and inmate Gardner (Pen. Code, § 187), and assault by a life prisoner that results in death (Pen. Code, § 4500). On appeal this court reversed petitioner's conviction for the murder of Patch, but it affirmed his conviction and death sentence for the murder of Gardner. (See *People v. Roberts, supra,* 2 Cal.4th at p. 294.)

In a petition for habeas corpus filed in this court, petitioner asserted, as relevant here, that inmate witnesses Long, Cade, and Yacotis had lied at trial. This court appointed Superior Court Judge Franklin R. Taft as referee to determine whether the inmate witnesses had discussed their trial testimony among themselves. Specifically, the order directed the referee to ascertain what Long, Cade, and Yacotis saw of the stabbing and heard petitioner say about it, and whether their trial testimony against petitioner diverged from their perceptions. After hearing testimony recorded in almost 3,000 pages of transcript, the referee found that Long, Cade, and Yacotis each had testified falsely against petitioner at trial.

We are not bound by a referee's findings on factual questions, but we accord them great weight if they are supported by substantial evidence. (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299].) We defer to the referee's factual findings, "especially those requiring resolution of testimonial conflicts and assessment of witnesses' credibility" because the referee had "the opportunity to observe the witnesses' demeanor and manner of testifying." (*Ibid.*)

## II. TESTIMONY OF INMATE LONG

At petitioner's capital trial, inmate Long testified that the day before the stabbing he heard petitioner threaten to kill fellow inmate Gardner. He also said that on the morning of the stabbing Long saw petitioner pull a prison-made knife from his clothes, stab Gardner, drop the knife, and run upstairs. In 1995 Long recanted his trial testimony, then in 1999 he retracted his recantation. The reference order directed the referee to determine whether Long heard petitioner discuss the stabbing beforehand, saw petitioner stab

Gardner, and then saw petitioner run upstairs. At the reference hearing, Long invoked his Fifth Amendment privilege not to incriminate himself.

The referee found that before petitioner's trial, while Long was housed at Chino prison with Leslie Rooks and David Calvin, these three prosecution witnesses were "overheard talking about the case, stating that they had to keep their [trial] testimony consistent." The referee found that Rooks and Calvin "did in fact discuss the case" but, "with the exception of Long," he did "not find any identifiable portion of their testimony to be fabricated."

At the reference hearing, inmate Ruben Howard testified that while incarcerated at Chino he overheard one of the Long/Rooks/Calvin trio say petitioner did not stab the victim. Howard also heard Long say that petitioner had nothing to do with the stabbing. The referee noted that in Long's 1995 recantation of his trial testimony against petitioner he specifically denied hearing petitioner discuss the stabbing of Gardner beforehand, seeing petitioner stab Gardner, or seeing petitioner flee up the stairs after the stabbing. Discounting Long's 1999 retraction of that recantation, the referee found that during the interview with prosecutors that led to the retraction, Long was as concerned that petitioner might get off death row so he would pose a risk to Long as he was concerned about the truth or falsity of his conflicting declarations. The fact that Long had received "money and better prison housing" as well as a promise that the prosecutor would make "favorable recommendations" at Long's parole hearing, coupled with Long's conflicting 1995 and 1999 declarations, led the referee to conclude that Long's trial testimony "should not be treated as believable."

The majority refuses to credit this finding by the referee because at the reference hearing Long exercised his Fifth Amendment privilege not to incriminate himself and consequently did not testify at the reference hearing other than to disclaim much memory of the crime. Thus, the majority reasons, the referee had no opportunity to assess Long's demeanor as a witness and hence Long's credibility.

This court's decisions have long applied the rule that "the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722 [114 Cal.Rptr. 429, 523 P.2d 229]; accord, *In re Hall* (1981) 30 Cal.3d 408, 418 [179 Cal.Rptr. 223, 637 P.2d 690] ["we routinely view recantations with suspicion"].) Although, as the majority points out, two Court of Appeal decisions have said that recantations are given "little credence" (maj. opn., *ante*, at pp. 742-743), this court has never adopted that standard. This court has never intimated that a recantation automatically is given "little credence." (See maj. opn., *ante*, at

p. 743.) Here the referee viewed with suspicion Long's recantation of his trial testimony, but he found that Long had fabricated his trial testimony against petitioner. I would give that finding great weight because it is supported by ample credible evidence.

The majority dismisses Long's 1995 recantation of his trial testimony against petitioner and his 1999 retraction of that 1995 recantation with the cursory comment that "it is clear that he has lied at some point." (Maj. opn., *ante,* at p. 743.) One cannot assume that either of Long's two versions was the truth. He may well have lied in both. What is clear is that Long is a liar. The referee found that because Long and the other inmates were "housed together" and because the investigators used leading and suggestive questions, "the inmate witnesses were able to learn the general theory of the prosecution's case." The prosecution's theory was this: Petitioner, armed with a knife, waited outside the first floor clinic with codefendant Menefield. When fellow inmate Gardner approached, petitioner stabbed, while Menefield restrained, Gardner. In the next two to three minutes, petitioner ran upstairs to his third floor cell.

Although Long did not testify at the reference hearing, and the referee thus was unable to observe his demeanor and evaluate his credibility, the referee did observe three witnesses testify about Long. Inmate Howard, who was not a trial witness, testified at the reference hearing that at Chino prison he heard Long say petitioner had nothing to do with the stabbing of inmate Gardner.

Inmate Arthur Givens testified at trial that at Chino prison Long said he had not been present at the stabbing, and that he and other inmates were trying to align their trial testimony. At the reference hearing, Givens expanded upon his trial testimony: Long said he was reluctant to testify at petitioner's trial, fearing the jury would discover they were lying, but Long planned to testify in order to get out of prison.

At trial inmate Yacotis testified that at Chino prison Long and Calvin were trying to tell consistent stories, but Yacotis denied overhearing lengthy coaching sessions between Long and Calvin, and denied saying he had overheard one of them say they were "lying for their freedom." At the reference hearing, Yacotis testified that Long said he and the other testifying inmates would do "anything" to get out of prison and that Long, as the leader of the inmates who testified for the prosecution, was insistent they get their stories straight before trial.

Thus, although the referee had no opportunity to assess whether inmate *Long's* reference hearing testimony was credible, the referee did have an

opportunity to hear and assess the credibility of *three other inmate witnesses* who testified that before petitioner's trial Long said he intended to testify falsely that petitioner had committed the stabbing, which Long acknowledged he had not seen. Moreover, the testimony of Yacotis and Givens at the reference hearing focused on Long's motive to give false trial testimony, namely, Long's stated belief that he would be released from prison in exchange for testifying against petitioner. Unlike the referee, neither the jury nor this court has had the opportunity to hear this testimony of these three witnesses.

Ample evidence presented at the reference hearing supports the referee's finding that Long's pretrial conduct and statements were at odds with his trial testimony. That evidence was bolstered by Long's 1995 recantation of his trial testimony, which he retracted in 1999 when he feared petitioner might be released from death row. (See *People v. Smallwood* (1986) 42 Cal.3d 415, 431, fn. 10 [228 Cal.Rptr. 913, 722 P.2d 197] [retraction of recanted trial testimony "cast[s] some doubt on the credibility" of the witness].) Because the referee had an opportunity to assess the credibility of three witnesses to Long's pretrial statements, and there is substantial evidence to support the referee's finding that Long's trial testimony against petitioner was false, I would adopt that finding.

## III. TESTIMONY OF INMATE CADE

Inmate Cade testified at petitioner's capital trial that he saw petitioner stab inmate Gardner, drop the knife, and run upstairs; shortly thereafter, while petitioner and Cade were both housed in a segregation unit, petitioner told Cade he had stabbed Gardner. This court's reference order directed the referee to determine whether Cade's trial testimony varied from what he had seen or heard at the Vacaville facility. Although Cade's testimony at the reference hearing was consistent with his trial testimony, at the reference hearing the defense presented evidence that severely undercut Cade's credibility as a witness. Newly disclosed documents and expert testimony about Cade's institutional and psychiatric history came into evidence at the reference hearing.

Dr. Douglas Tucker, a forensic psychiatrist, testified that inmate Cade had a history of significant mental illness with several prior hospitalizations and in 1977 was found incompetent to stand trial. In February 1980, when Cade arrived at the Vacaville Medical Facility, medical records described him as psychotic, suffering hallucinations, and having inflicted injury on himself. By Cade's account he stopped taking his antipsychotic medication about a week before the stabbing. In Dr. Tucker's view, Cade's ability to perceive,

recall, remember, and relate events on August 17, 1980, the date of inmate Gardner's stabbing, was probably somewhat impaired by the week without the medication Cade took to control aural or visual delusions. Dr. Tucker found various entries in the series of newly disclosed documents suggesting Cade was untruthful or unreliable, but Dr. Tucker offered no opinion on whether Cade had given truthful or untruthful trial testimony. As the referee notes, Dr. Tucker concluded "that Cade's story was adjustable depending on what was to his advantage."

Dr. Tucker further testified that although inmate Cade had a fairly severe mental illness, in conversation Cade would appear normal and could describe events he had seen. The referee specifically asked Dr. Tucker, assuming that Cade was delusional or hallucinatory, "Could a delusional event be created by the suggestion of someone else, such as a person interviewing Cade who feeds him some of the facts during questioning?" Tucker agreed that the effect of such suggestions could be to "modify and adjust [Cade's] memory or perceived memory of what occurred."

Deputy Attorney General Charles Kirk, the prosecutor at petitioner's capital trial, testified at the reference hearing that Cade did not exhibit signs of mental illness at trial, that Kirk had seen the notation "insane" on Cade's rap sheet, but that Cade had good recall of the stabbing. Members of the prosecution team testified at the reference hearing that in questioning Cade they had disclosed details of the stabbing, such as the number and location of Gardner's wounds.

In light of the evidence summarized above, the referee concluded that although "Cade's general account of the stabbing itself remained consistent" with his trial testimony, his testimony at the reference hearing was "evasive and often at variance with prior testimony." The referee found Cade's trial testimony "not truthful."

Seizing on the referee's isolated finding that Cade's reference hearing description of the stabbing was "consistent" with his trial testimony, the majority considers "irrelevant" the referee's answer to our question whether Cade's testimony varied from what he actually saw or heard at the Vacaville facility in connection with inmate Gardner's stabbing. (Maj. opn., *ante*, at p. 744.) The majority points out that at the reference hearing Cade did not give new evidence beyond what the jury heard at trial, and therefore this court should defer to the jury's assessment of Cade's credibility.[1]

The majority misses the point. True there was no new evidence from Cade. Instead, there was evidence that Cade may have been delusional at the

---

[1]The majority notes that on appeal this court indicated that Cade's trial testimony was thoroughly impeached. (Maj. opn., *ante*, at p. 744.) Cade was impeached with his reluctance

time of Gardner's stabbing, that he was anxious to tailor his story to suit the investigators, and that he was especially susceptible to having his perception of events altered by details of the crime learned from others. The jury at petitioner's capital trial, however, never heard testimony about Cade's mental health. The referee, who did, was in a better position to evaluate Cade's credibility.

In my view, there is substantial evidence to support the referee's finding that inmate Cade falsely testified at petitioner's capital trial that he saw petitioner stab inmate Gardner. I would adopt the referee's finding.

## IV.   TESTIMONY OF INMATE YACOTIS

Inmate Richard Yacotis testified at petitioner's capital trial that after the fatal stabbing of inmate Gardner, while housed in a segregation unit, he overheard a conversation between petitioner and codefendant Menefield. Petitioner asked Menefield why he had not picked up "the knife." Menefield replied, "Because I was running right behind you up the stairs." In 1995, Yacotis recanted that trial testimony, claiming that he had testified for the prosecution because he feared for his safety.

At the reference hearing in 2000, Yacotis stood by his recantation. He testified that he was originally going to testify for petitioner at trial, but switched sides when the prosecution told him that he "could be put on the [main] line as easily as [he could] be taken off." Fearing retaliation by other inmates were he in the general prison population, Yacotis testified for the prosecution, feigning illiteracy in an effort to explain inconsistencies between his trial testimony and an earlier statement that bore his signature but had been prepared by another inmate.

At the reference hearing, Yacotis acknowledged being housed in the segregation unit two cells away from petitioner, but said he had lied about overhearing a conversation between petitioner and Menefield about the stabbing of inmate Gardner. He added that petitioner and Menefield were not housed close to one another in the segregation unit. Seeking to undercut Yacotis's account, the majority points to prison records showing that after the stabbing, petitioner and Menefield had been housed in the segregation unit near one another for three days. Yacotis, however, consistently testified

to identify either petitioner or Menefield or other inmates who witnessed the stabbing, and with inconsistencies between his preliminary hearing testimony and his trial testimony as to which inmates were present. Because the jury did not hear any impeachment of Cade's *ability* to perceive and recount the events of the crime, only of his *willingness* to name names, its assessment of Cade's credibility as a witness was made without any evidence of Cade's mental problems or his suggestability, and the impact of those problems on his credibility.

at trial and at the reference hearing that in the segregation unit he and petitioner were housed on one tier, and Menefield on another.

Although the referee recognized that recantations should be viewed with suspicion (*In re Weber, supra,* 11 Cal.3d at p. 722), the referee found Yacotis to be "sincere" and his reference hearing testimony "believable," in part because Yacotis, who was out of prison at the time of the reference hearing, believed that were he ever to return "his recantation of his trial testimony would cause [him] difficulty with the authorities." The majority acknowledges that the referee's finding is entitled to great deference. It nonetheless concludes that the finding "even if believed" would not warrant habeas corpus relief. (Maj. opn., *ante,* at p. 743.)

Unlike the majority, I am persuaded not only that Yacotis gave false testimony against petitioner at the latter's capital trial, but that the testimony was damning evidence of petitioner's guilt. The conversation between petitioner and codefendant Menefield that Yacotis claimed to have overheard was, in effect, a confession by petitioner that he had stabbed Gardner and then fled, dropping the knife for Menefield to pick up. Moreover, it was an especially dramatic confession because it conformed exactly to the prosecution's theory of the stabbing of Gardner.

## V. Eyewitnesses to Stabbing

Of the five inmates who testified against petitioner at his capital trial as eyewitnesses to the stabbing of inmate Gardner, three identified petitioner as the stabber—Raybon Long, Ryland Cade, and Robert Hayes. Hayes was apparently deceased at the time of the reference hearing. The referee found no evidence that the trial testimony of Hayes was false.

False evidence is that which "is substantially material or probative on the issue of guilt" (Pen. Code, § 1473, subd. (b)(1)); it is evidence so significant that " '*with reasonable probability* it *could have* affected the outcome . . . .' [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 546.) A reasonable probability is "such as undermines the reviewing court's confidence in the outcome." (*Ibid.; In re Malone* (1996) 12 Cal.4th 935, 965 [50 Cal.Rptr.2d 281, 911 P.2d 468].) The reasonable probability standard is an objective one, measured in light of all the relevant circumstances. (*Ibid.*) Here, the trial testimony of witnesses Long, Cade, and Yacotis was substantially material and with a reasonable probability could have affected the outcome of petitioner's capital trial. Long and Cade both testified they saw petitioner stab Gardner. Without their testimony, the trial evidence identifying petitioner as the stabber is greatly weakened. According to inmate witnesses David Calvin and Norman Goodwin, it was Menefield who had stabbed Gardner.

At the reference hearing, the referee found that "Calvin generally reiterated his trial testimony." Calvin testified that he saw two men involved in the attack on Gardner, but that the stabber was Menefield; although Calvin knew petitioner, the second man whose face he saw from 12 feet away was not petitioner. The referee found that no evidence had been presented to suggest Calvin's trial testimony varied from what he saw during the stabbing.

Goodwin had testified at trial that he saw two men attack Gardner. One of the assailants was Menefield who stabbed Gardner three times, then ran up the stairs, followed closely by a second man whom Goodwin could not identify. Goodwin's testimony was not included in our reference order.

Without the trial testimony of Long and Cade, there was only the testimony of Hayes that petitioner stabbed Gardner. By contrast, two witnesses, David Calvin and Norman Goodwin, testified that it was not petitioner but Menefield who was the stabber. Neither Calvin nor Goodwin identified the man accompanying Menefield; Calvin was certain that Menefield's companion was not petitioner, whom Calvin had seen go upstairs before the stabbing, which occurred on the ground floor. Although there was testimony at trial that petitioner had threatened Gardner and was seen with a prison-made knife on the morning of the stabbing, it is reasonably probable that the jury would not have found petitioner guilty of assault and murder of Gardner without the false testimony of either Long or Cade, or both, that they saw petitioner stab Gardner, an account at odds with the testimony of eyewitnesses Calvin and Goodwin that it was Menefield, not petitioner, who had stabbed Gardner.

Accepting the findings of the referee, as I do, it is reasonably probable that the jury, faced with conflicting evidence of who had stabbed inmate Gardner in the hallway melee, would not have convicted petitioner of Gardner's murder but for the false testimony from two fellow inmates that petitioner had confessed to stabbing Gardner. Accordingly, I would grant petitioner habeas corpus relief. (Pen. Code, § 1473, subd. (b)(1).)

George, C. J., concurred.