Filed 7/11/11

# IN THE SUPREME COURT OF CALIFORNIA

In re MARK CHRISTOPHER CREW　　　)
　　　　　　　　　　　　　　　　　　　)
on Habeas Corpus.　　　　　　　　　　)　　　　　S107856
_____)

　　　　A jury convicted petitioner Mark Christopher Crew of one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of grand theft (§§ 484, 487). It found true a special circumstance allegation that the murder was for financial gain. (§ 190.2, subd. (a)(1).) The jury fixed the penalty for the murder at death. On petitioner's automatic appeal (Cal. Const., art. VI, § 11; Pen. Code, § 1239), this court affirmed the judgment (*People v. Crew* (2003) 31 Cal.4th 822).

　　　　Petitioner filed a timely petition for a writ of habeas corpus seeking relief from the judgment. He alleged, among other things, ineffective representation by his trial counsel at the penalty phase of his capital trial for failing to adequately investigate and present mitigating evidence. We issued an order to show cause limited to this claim.

　　　　After the filing of the Attorney General's return and petitioner's reply to it, we determined that disputed questions of fact required an evidentiary hearing. On September 13, 2006, we appointed as referee the Honorable Andrea Y. Bryan, a

---

[1]　　All further statutory references are to the Penal Code unless otherwise indicated.

1

superior court judge in Santa Clara County, and directed her to take evidence and make findings of fact on these questions:

"1. What information did petitioner's trial counsel have when deciding on the scope of his investigation into potential mitigating evidence?

"2. What actions did petitioner's trial counsel take to investigate potential evidence that could have been presented in mitigation at the penalty phase of petitioner's trial? What were the results of that investigation?

"3. What tactical justifications, if any, does petitioner's trial counsel offer for (a) limiting the scope of his investigation and conducting the investigation in the manner that he did, and (b) in limiting the presentation of penalty phase evidence in the manner that he did?

"4. What additional mitigating evidence could petitioner have presented at the penalty phase? How credible was this evidence?

"5. What investigative steps would have led to this additional evidence?

"6. What circumstances weighed against the investigation or presentation of this additional evidence[?] What evidence damaging to petitioner, but not presented by the prosecution at the guilt or penalty phase of trial, would likely have been presented in rebuttal if petitioner had introduced this evidence?

"7. Did petitioner do or say anything to hinder or prevent the investigation or presentation of mitigating evidence at the penalty phase, or did he ask that any such evidence not be presented? If so, what did he do or say?"

At the evidentiary hearing, which lasted four days, 12 witnesses testified. The referee then submitted to this court a 19-page report, which included factual findings. After our review of the record and the referee's report, we conclude that petitioner has not established that he is entitled to habeas corpus relief.

# I. TRIAL EVIDENCE

The evidence supporting the judgment of death is set forth in *People v. Crew*, *supra*, 31 Cal.4th 822, and is summarized here.

## A. Guilt Phase Evidence

In 1981, petitioner met murder victim Nancy Jo Wilhelmi Andrade in a bar in San Jose, California. Nancy owned a purebred horse and a Ford pickup truck. In January 1982, during a break in her intermittent romantic relationship with petitioner, Nancy bought a yellow Corvette automobile. After Nancy and petitioner resumed their relationship, petitioner talked to his friend Richard Elander about killing Nancy.

Petitioner asked Nancy to move with him to Greer, South Carolina, where petitioner's mother and stepfather lived. When Nancy insisted on getting married first, petitioner married her in June 1982. The marriage was troubled from the outset. Petitioner was rarely with Nancy, spent time with other women, and in June 1982, the same month in which he married Nancy, asked yet another woman, Lisa Moody, to marry him. (Petitioner and Moody did not get married.)

In July 1982, petitioner and his friend Elander moved to Greer, South Carolina, while Nancy remained in California. Also in July, Nancy and her friend Darlene Bryant took a trip across the country; during a stop in Greer, Nancy spent the night with petitioner. After Nancy's visit, petitioner talked to his stepfather, Bergin Mosteller, about killing Nancy and discussed with Elander different ways of killing her.

In August 1982, after returning to California from South Carolina, Nancy often spoke with petitioner by phone. After deciding to move to South Carolina, she closed out her bank accounts, obtaining $10,500 in cash as well as a money order for $2,500. On August 21, 1982, when Nancy was staying at Darlene's house, petitioner and his stepfather arrived at the house in a station wagon, which

3

was pulling a horse trailer. The plan was to have petitioner's stepfather drive the station wagon to Texas, where he would leave Nancy's horse with petitioner's relatives; Nancy and petitioner were to follow in Nancy's Corvette and truck.

On August 23, 1982, Nancy and petitioner went to Nancy's parents' house in Santa Cruz, California, to pick up her dog and belongings. That same day they left for South Carolina; that night, petitioner registered at a motel in Fremont, California. The next day, petitioner visited Lisa Moody at her home in Newark, California. On August 28, petitioner and Moody left for South Carolina. Along the way they stopped at the home of petitioner's grandmother in Texas; while there, petitioner received a phone call that upset him. Petitioner and Moody then went to South Carolina, where petitioner opened a bank account in which he deposited murder victim Nancy's $2,500 money order; petitioner's friend Elander and stepfather Mosteller sold Nancy's clothing, horse trailer, and horse.

On the day that petitioner and Lisa arrived in South Carolina, he described to Elander the details of Nancy's death: After petitioner and Nancy left San Jose, California, in separate vehicles, they stopped and walked up a hillside into the woods, where petitioner shot Nancy in the back of her head and rolled her body down a ravine. He then went to his friend Bruce Gant's house in Campbell, California, and the two of them drove to the murder scene to retrieve the vehicle that had been left there. The next evening, petitioner and Gant got drunk and went back to the site of the murder. When petitioner saw that Nancy's body had moved, he "freaked out" and told Gant. Gant then went down the ravine, where he tried to strangle Nancy and break her neck. He eventually cut her head off. Thereafter, Gant and petitioner put Nancy's body in a 55-gallon drum filled with cement and buried it in the backyard of Gant's house; they put Nancy's head in a five-gallon bucket filled with cement and threw it off the Dumbarton Bridge between Alameda and San Mateo Counties, California.

4

In mid-September 1982, petitioner and Lisa Moody came back to California. Petitioner then sold murder victim Nancy's truck, forging her signature to the certificate of title. On October 13, petitioner told Moody that the phone call he had received while in Texas was from his friend Bruce Gant, who had complained that the body petitioner had buried in Gant's backyard was "beginning to stink."

After petitioner's return to South Carolina, he sold Nancy's Corvette to Marion Mitchell. When Mitchell repeatedly asked for title documentation to the car, petitioner's friend Elander told Mitchell that petitioner had killed his wife, cut off her head, put her body in a barrel filled with cement, and buried it in a backyard.

In January 1983, petitioner moved to Connecticut. There he stayed with Jeanne Meskell, with whom he had had a previous romantic relationship. He told Meskell that the body of a girl he had killed was in two pieces in two drums filled with cement, and that one drum was in San Francisco Bay and the other was in a backyard.

Police searches of Gant's house and yard did not turn up any evidence. Nancy's body was never found.

**B. Penalty Phase Evidence**

The parties stipulated that petitioner had no prior felony convictions. The prosecution did not present additional evidence in its case-in-chief at the penalty phase of petitioner's capital trial.

Petitioner presented evidence of his childhood, his success as a soldier while in the Army, his positive relationships with women, and his compassionate acts for others.

Petitioner's father, William Crew, testified that petitioner was born in 1954 and that in 1957 the family moved from Fort Worth, Texas, to Novato, California,

5

and then in 1966 to Petaluma, California.  Petitioner did well in school and was involved in sports.  He was never physically abused.  Petitioner's parents divorced in 1969.  Petitioner and his father then moved to San Jose, California.

In 1970, when petitioner was 15 years old, his father remarried.  Petitioner did not get along with his stepmother and one of her three children.  When he was 17 years old, petitioner quit high school and joined the Army.

In the Army, petitioner became a squad leader in charge of 12 to 14 men, rose to the rank of sergeant, and became the driver for the base commander, Colonel Donald Pearce.  The latter testified that petitioner was intelligent, dependable, possessed common sense, and was mature.  While in the Army, petitioner married his high school girlfriend, Patricia Silva, and they had a daughter.  The marriage ended in divorce before petitioner's honorable discharge from the Army.  After the discharge, petitioner married Debra Lunde.  When this marriage ended, petitioner moved to Texas.  Petitioner returned to California, where he worked as a truck driver and attended junior college.

Emily Bates testified that she had a romantic relationship with petitioner and that he treated her well.  Kathy Harper testified that, when she was financially destitute, petitioner moved in with her and provided financial support for her and her son.  Petitioner's friend, James Gilbert, described petitioner as a caring and generous person.  Irene Watson, petitioner's grandmother, testified that petitioner took care of her for two to three months when she was ill.

Three Santa Clara County Sheriff's deputies testified that petitioner, while in jail awaiting trial, interacted well with prisoners and staff and had at times acted to prevent trouble in the jail.  Jerry Enomoto, the former head of the California Department of Corrections (now Department of Corrections and Rehabilitation), stated that in his opinion petitioner would not be a high security risk in prison if sentenced to life without the possibility of parole.

6

In rebuttal, the prosecution presented testimony by a jail informant that petitioner had talked about needing to escape because he was going to be found guilty of killing a woman.

## II.  REFERENCE HEARING

### A.  Evidence and Referee's Findings Regarding Trial Investigation and Evidence at Penalty Phase

At the habeas corpus reference hearing, the following evidence was presented:

In July 1987, petitioner retained Joseph O'Sullivan to represent him at the capital trial, which was scheduled for September 19, 1988.  Shortly before that trial date, O'Sullivan requested a six-month continuance to deal with problems related to his stress and alcohol abuse.  The trial court continued the trial to April 17, 1989.

In November 1988, Joseph Morehead became second counsel.  Morehead was an experienced criminal defense attorney, but he had never before been counsel in a death penalty case.  At petitioner's trial, Morehead had a dual role: one was to assist lead attorney O'Sullivan at the guilt phase; the other was to prepare and present a defense at the penalty phase.  At the time of Morehead's appointment, lead attorney O'Sullivan had not done any work to prepare for the penalty phase.  In O'Sullivan's opinion the case would not proceed to the penalty phase.  O'Sullivan had a number of meetings with petitioner, asked him about his background, constantly asked if there was anything the defense was missing, and described the term "mitigating evidence" by reading to petitioner the applicable Penal Code statutes.

Before trial, second counsel Morehead talked to petitioner's grandmother, Irene Watson, as well as petitioner's father, with whom Morehead met on numerous occasions and upon whom he relied for information about petitioner's

7

background. Petitioner's father said that petitioner had a normal childhood until the father's remarriage. He described petitioner's mother as "cold and withdrawn," but he never mentioned any childhood sexual abuse of petitioner by his mother.

In preparing for the penalty phase, Attorney Morehead told petitioner about the type of evidence that could be presented at a penalty phase and asked petitioner about his childhood. Petitioner said that he had a good life until his mother and father divorced. Petitioner mentioned his drug abuse and his many romantic relationships with women. Petitioner never mentioned sexual abuse by his mother, nor did he say anything about exposure to a sexually charged environment by his grandfather.

Attorney Morehead decided to focus at the penalty phase on mitigating evidence in three categories: (1) evidence of petitioner's positive background, with no criminal history; (2) evidence that not all of petitioner's relationships with women were manipulative and exploitative; and (3) evidence that petitioner had been a model prisoner while in jail awaiting trial in this case.

In February 1989, Attorney Morehead hired John A. Murphy as an investigator to assist in preparation for both the guilt and penalty phases. From February until July 1989, Murphy focused exclusively on investigation for the guilt phase. In early July, Morehead and Murphy discussed developing mitigating evidence for the penalty phase; Morehead wanted to portray petitioner as a "good man," with no previous criminal record. Murphy met with petitioner a number of times, but he did not ask petitioner about his family life or background. Petitioner never said anything to Murphy that was unflattering about himself or his family. Investigator Murphy's efforts were directed towards locating penalty phase witnesses, finding military and jail records pertaining to petitioner, and finding an

expert to testify that petitioner would have no problem adjusting to prison if sentenced to life without possibility of parole.

Second counsel Morehead had only one contact with petitioner's mother and that was during the guilt phase when petitioner and his mother met in a jury room at the court. At that time, petitioner was shackled to a chair and his mother greeted him with a hug and a kiss and then sat on petitioner's lap.

Morehead retained psychiatrist Frederick James Phillips to evaluate presentation of a mental state defense for the guilt phase. Dr. Phillips spent approximately 20 minutes interviewing petitioner but submitted no report. Attorney Morehead also consulted Dr. David E. Smith, an expert on addiction and clinical toxicology. Morehead initially considered presenting Drs. Phillips and Smith as expert witnesses at the penalty phase but then decided against it for fear of enabling the prosecution in its cross-examination to put before the jury again the facts relating to the murder, such as the dismemberment of Nancy's body and petitioner's refusal to tell anyone where the body was. Morehead did not present any expert testimony at either the guilt phase or the penalty phase of the trial.

In early April 1989, Attorney Morehead filed a motion to strike the sole special circumstance allegation that the murder was committed for financial gain. At a hearing on April 17, the day jury selection began, the trial court questioned whether the special circumstance allegation was appropriate, but said that it would await trial testimony before ruling on the defense motion. The trial court gave both the prosecution and the defense a copy of a memorandum that the court's law clerk had prepared, which recommended striking the special circumstance allegation.

On July 17, 1989, when the prosecution rested its case, the trial court denied the defense motion to strike the special circumstance allegation.

At the habeas corpus evidentiary hearing in 2007, the referee found that trial counsel Morehead "was confident that he had filed a viable motion to strike the special circumstance allegation," particularly in light of the trial court's initial concern — expressed before the presentation of any trial testimony — about the propriety of the special circumstance allegation. It was only much later, when the trial court denied the defense motion — a ruling made after the prosecution had rested its case — that Morehead realized, in the referee's words, "there might be a penalty phase." The penalty phase began two weeks later, on August 1, 1989.

At the penalty phase, the defense presented evidence that petitioner had a normal childhood until his parents divorced, had good relationships with women, had done well in military service, and would not be a problem in prison if sentenced to life without possibility of parole.

The referee found that this defense evidence enabled the prosecution to argue at the penalty phase that petitioner had used his advantages of a "decent background," his love of family, and his leadership abilities for the purposes of "incredible evil."

## B. Evidence Regarding Petitioner's Background

At the reference hearing, petitioner presented the testimony, as well as the declaration, of clinical psychologist Larry Allen Morris, a specialist in the treatment and evaluation of perpetrators and survivors of childhood sexual abuse. Relying on resources and research available at the time of the penalty phase of petitioner's capital trial in 1989, Dr. Morris assessed petitioner's social history to determine any childhood sexual abuse (a possibility first raised by petitioner's habeas corpus counsel) and the impact of such abuse, if any, on petitioner's development. Dr. Morris reviewed documents pertaining to petitioner and his family, such as petitioner's medical, school, and military records; declarations

10

obtained by petitioner's habeas corpus counsel; and documents as well as testimony presented at petitioner's trial. He also interviewed a number of witnesses, and he interviewed petitioner for five hours.

Dr. Morris testified at the reference hearing that at the time of petitioner's penalty phase trial it was established that sexual abuse of male children could produce long-term effects pertaining to self-esteem, relationships, depression, addictions, and compulsive sexual activity.

Dr. Morris stated that petitioner's social history indicated the prevalence of sexual abuse and incest. Petitioner's maternal grandfather had sexually molested petitioner's mother from childhood through adolescence, and had exposed his grandsons to inappropriate sexual conduct. Petitioner's paternal grandfather was romantically involved with women other than his wife.

Dr. Morris also testified that petitioner's father was 17 years old when he married petitioner's mother, who was then 16 years old. Petitioner's father was often away from home, and he had numerous extramarital affairs. Petitioner's mother was depressed and withdrawn. She would stay in bed for days at a time. She rarely went outside the home. In the 1960's, when petitioner was an adolescent, he was "sexually exploited" by his maternal grandfather, Jack Richardson, who attempted to get petitioner and his older brother to engage in sexual activities with young girls for Richardson's amusement. After petitioner's parents divorced in 1969, petitioner lived with his father, who remarried in 1970. Petitioner's father continued his heavy drinking and with his second wife would have adult "sexually charged" parties that petitioner and his friends attended when petitioner was in high school. Petitioner's father molested his second wife's daughter for about six years during her preteen and teenage years.

In a five-hour interview, Dr. Morris learned the following from petitioner: When petitioner was six or seven years old, his mother would get into the bathtub

11

with him and hold him sideways so that petitioner's hip bone was between her legs. She also would sit on the toilet when petitioner was taking a bath, and after urinating would have petitioner wipe her with toilet paper. From petitioner's earliest memories, and continuing for many years, his mother would bring him into her bed, place his wrist between her legs or drape her body over him and straddle one of his legs followed by her rubbing or pushing repeatedly against him. Petitioner was encouraged by his maternal grandfather to engage in sexual activities with girls when he was very young, and as a teenager he had a number of sexual experiences with older women. Petitioner began drinking alcohol and using illegal drugs while in junior high school. This pattern continued through high school and into his adult years, when he would frequently smoke marijuana and use drugs such as methamphetamine and cocaine. In the years before the murder in this case, petitioner was extremely depressed, and his substance abuse increased significantly.

In Dr. Morris's opinion, petitioner was sexually abused by his mother throughout his childhood, and was exposed to an oversexualized environment by his maternal grandfather. According to Dr. Morris, molestation in petitioner's family and aberrant sexual behavior by the maternal grandfather should have been "red flags" warranting an investigation by the defense as to whether petitioner was a victim of child molestation. "[A]ny reasonably competent mental health professional," Dr. Morris stated, would have done so.

On cross-examination by the Attorney General at the reference hearing, Dr. Morris acknowledged that petitioner's symptoms, such as substance abuse and multiple sexual relationships with women, were also consistent with a diagnosis of antisocial personality disorder, and that there was "no external extrinsic evidence that [petitioner] was sexually abused . . . ."

12

At the reference hearing, petitioner also presented the testimony of psychiatrist Frederick James Phillips. At the time of petitioner's murder trial, Dr. Phillips had been asked by defense counsel to perform a mental status examination of petitioner. Dr. Phillips did not then know that the case involved the death penalty; he had never before dealt with a capital defendant. His task was to evaluate petitioner's mental state at the time of the murder and petitioner's mental state at the time of trial. He spent 20 minutes talking to petitioner. He also spoke with petitioner's father, but was not told about any family history of mental illness. He unsuccessfully tried to contact petitioner's mother.

On the Attorney General's cross-examination at the evidentiary hearing, Dr. Phillips stated that he had not submitted a report to petitioner's trial counsel because there was no useful information to provide. Phillips explained that during the interview at the jail, he asked petitioner general questions about his childhood and about his family life, to which petitioner responded that he "grew up in a normal home under normal circumstances." Petitioner made no negative comments about his mother or his father. Dr. Phillips stated that if at the time of petitioner's trial he had been told about sexual abuse in petitioner's family, and about petitioner's depression, compulsive womanizing, and drug and alcohol abuse, one of Phillip's conclusions — but not necessarily the most likely one — would have been that petitioner had been sexually abused.

Petitioner also presented at the reference hearing the declaration of Dr. David E. Smith, a specialist in addiction medicine and clinical toxicology with experience testifying as an expert at the penalty phase of capital trials. Although petitioner's trial counsel had consulted Dr. Smith regarding the impact of drug and alcohol use on petitioner's mental state at the time of the murder, Dr. Smith had no recollection of his trial involvement. After petitioner had been sentenced to death, petitioner's habeas corpus counsel asked Dr. Smith to assess the impact of

13

petitioner's drug and alcohol history on petitioner's mental state and functioning. To do that, Dr. Smith reviewed Dr. Morris's declaration summarizing petitioner's social history, declarations provided by petitioner's habeas corpus counsel, and documents from petitioner's trial. He also interviewed petitioner and individuals with knowledge of petitioner's drug and alcohol use.

In the opinion of Dr. Smith, petitioner has "addictive disease, consisting of drug and alcohol dependence" and is "genetically predisposed to drug and alcohol dependence as well as to depression." Petitioner's abuse of drugs and alcohol, starting when petitioner was 13 years old and continuing with increasing frequency and severity, derailed his psychological development and adversely affected his judgment and reasoning. Had Dr. Smith been provided the information concerning petitioner's drug and alcohol abuse and depression, he would have told petitioner's trial counsel that there was a strong case for mitigation based in part on substance abuse, and he would have advised counsel to develop a comprehensive medical, psychological, and social history of petitioner.

Another witness for petitioner at the reference hearing was his former girlfriend, Cynthia Pullman. She testified that petitioner drank alcohol "all the time," used cocaine, suffered from insomnia, experienced sexual dysfunction, and often became very depressed.

Emily Vander Pauwert, formerly Emily Bates, who had been a defense witness at petitioner's capital trial, also testified on his behalf at the reference hearing. She had been romantically involved with petitioner in the late 1970's or early 1980's. She testified that he regularly drank heavily, that he would drink to excess with his father when they were together, that he would sleep for long periods of time and have nightmares, and that he had bouts of depression. She described petitioner's mother, whom she had met once, as "very distant and cold"

14

towards him. Petitioner told her his mother had been abusive, but he did not say whether the abuse was physical or mental.

Patricia Silva, petitioner's first wife, testified that petitioner used marijuana, barbiturates, and occasionally LSD when he was in high school, and that he was a heavy beer drinker. His drug and alcohol abuse continued after they were married and moved to Georgia, where petitioner was stationed while in the Army. Petitioner had mood swings; he would often become very depressed and would sleep excessively during the day. Petitioner never told her that his mother had sexually molested him.

Doug Tompkins, who became petitioner's stepbrother after petitioner's father married Tompkins's mother, testified that he once saw his stepfather (petitioner's father) put his hand down the pajama top of Tompkins's eight-year-old sister. Tompkins did not see petitioner get drunk very often; he saw petitioner smoke marijuana "a handful of times," but he never saw petitioner use cocaine or amphetamines.

Admitted into evidence at the reference hearing was the deposition of Eddie Richardson, petitioner's uncle and his mother's brother; the deposition was taken while Richardson was incarcerated in Texas for statutory rape. Richardson stated that his father (petitioner's grandfather) physically abused him and petitioner's mother, and that his father had sexual relations with young girls. Richardson's sister (petitioner's mother) told him that their father had sexually molested her. He had no knowledge of petitioner's mother's sexual abuse of her children, behavior that would be "out of character" for her.

Petitioner also presented the declaration of John Turner, the son of the second wife of Jack Richardson (petitioner's grandfather), stating that petitioner's grandfather had molested young girls. Also presented was deposition testimony

15

by two women that Eddie Richardson, petitioner's uncle, molested them from when they were young girls until they were teenagers.

Testifying for the prosecution at the reference hearing was forensic psychologist Daniel Martell. He said that on the record presented, he could not reach a conclusion as to whether petitioner's mother had sexually abused petitioner as a child. According to Dr. Martell, the symptoms of depression, substance abuse, and sexual promiscuity are not symptoms specific to sexual abuse because many other disorders, including antisocial personality, have the same symptoms. Because childhood sexual abuse by one's mother is rare, Dr. Martell considered it "farfetched" to suggest that the symptoms indicated were distinctly characteristic of "sexual abuse by one's mother." He also said that it "was unsupportable by the literature" to suggest that any competent mental health professional would have looked for sexual abuse by the mother. He further stated that although the record would support a conclusion of sexual abuse of women by petitioner's male family members, there was no indication that any of the males were sexually abused.

**C. Referee's Report**

As noted at the outset, this court's reference order asked the referee to hold an evidentiary hearing and make findings of fact on seven questions, which we discuss below.

*1. Question No. 1*

Our first question asked what information petitioner's trial attorneys had when they determined the scope of the investigation into potentially mitigating evidence to be presented at the penalty phase of petitioner's capital trial. The referee found that trial counsel knew that petitioner (1) had no prior criminal history; (2) had a good, fairly normal childhood; (3) had a pattern of drug and

16

alcohol abuse; (4) had relationships with many women and difficulty maintaining long-term relationships; and (5) suffered from sleep disorders and depression.

### 2. *Question No. 2*

Our second question asked what actions petitioner's trial counsel took to investigate potentially mitigating evidence that could have been presented at the penalty phase, and the results of that investigation. The referee found that lead trial counsel O'Sullivan did no investigation, but that he did ask petitioner about his background, that he repeatedly asked petitioner if there was anything the defense should know, and that he explained the essence of mitigating evidence by reading to petitioner the applicable Penal Code statutes. As to second trial counsel Morehead, the referee found that his focus was on the positive aspects of petitioner's life. The referee also found that petitioner's father had told Morehead that petitioner's childhood was relatively normal, that petitioner's mother was cold and withdrawn, and that petitioner started having problems at age 15 after his parents divorced. The referee further found that defense trial investigator Murphy did not start investigating the existence of any potentially mitigating evidence until July 1989, shortly before commencement of the penalty phase, and that Murphy did not ask petitioner about his family life or background.

### 3. *Question No. 3*

Our third question asked the referee to determine trial counsel's tactical justifications in limiting the scope of the investigation into, and presentation of, potentially mitigating evidence at the penalty phase. The referee found that neither lead counsel O'Sullivan nor second counsel Morehead had articulated any tactical justification. Additionally, the referee found that Morehead had decided not to present at the penalty phase any testimony by mental health experts because of his concern that the prosecution's cross-examination of such witnesses would

17

have reminded the jury of the facts surrounding the murder of petitioner's wife, Nancy.

### 4. Question No. 4

Our fourth question asked the referee what additional mitigating evidence the defense could have presented at the penalty phase of petitioner's capital trial, and to determine the credibility of such evidence.

With regard to petitioner's family history, the referee found that petitioner's father had molested his eight-year-old stepdaughter, that petitioner's maternal grandfather (Jack Richardson) had sexually abused not only petitioner's mother but also his granddaughter and a neighbor girl. The referee further found that petitioner's maternal uncle (Eddie Richardson) had molested his own daughter and granddaughter, and other young girls.

On the issue of drug and alcohol abuse, the referee found that such abuse by petitioner began at an early age, continued through his life, and increased in the years immediately before his arrest for Nancy's murder. Petitioner's father started drinking at an early age and continued to do so throughout his life.

The referee found a history of mental illness in petitioner's family. Petitioner's maternal grandfather had mental health problems, and the grandfather's older brother (Dewey) was a psychotic who had been institutionalized. Petitioner's paternal grandmother was unstable and suffered from depression and anxiety. With respect to petitioner, he suffered from depression, anxiety, low self-esteem, sleep disorders, and occasional sexual dysfunction.

As to expert testimony on sexual abuse, the referee quoted from Dr. Morris's declaration, which petitioner had presented at the reference hearing. The declaration expressed Dr. Morris's opinion that petitioner was sexually abused by his mother beginning at an early age and continuing through his

18

childhood, and that petitioner was exposed to an "extraordinary oversexualized environment" by his maternal grandfather, who encouraged petitioner to engage in sexual misbehavior for the grandfather's pleasure. The psychological impact of this sexual abuse, Dr. Morris's declaration stated, was made worse when petitioner's father and brother exposed him to additional inappropriate sexual experiences. According to Dr. Morris, these negative experiences adversely affected petitioner's emotional well-being, his ability to develop interpersonal relationships, and his sexual development.

On the issue of substance abuse, the referee quoted the opinion of petitioner's expert Dr. Smith that petitioner "suffered from chronic alcohol and drug dependence stemming from his traumatic upbringing and family history, which had a long term deleterious effect on his mental health and functioning . . . ."

As to the credibility of evidence presented at the reference hearing on the issue of mitigating evidence, the referee stated that she had "no reason to doubt the veracity of any of the evidence that was presented" and that she accepted the evidence as "valid."

### 5. *Question No. 5*

Our fifth question asked the referee what investigative steps petitioner's trial counsel could have taken to uncover additional mitigating evidence for presentation at the penalty phase of petitioner's capital trial. The referee found that trial counsel could have discovered such evidence by traveling to the locations of witnesses, documents, and records, and by interviewing the various witnesses, just as habeas corpus counsel had done. The referee also found that at the time of trial petitioner's counsel could have retained an expert, such as Dr. Morris, on male victims of sexual abuse.

19

### 6. *Question No. 6*

Our sixth question asked the referee to determine whether any circumstances would have hindered defense trial counsel's investigation into, or the presentation of, additional mitigating evidence at the penalty phase, and what evidence damaging to petitioner, but not presented by the prosecution at the guilt or penalty phase of trial, would likely have been offered on the prosecution's rebuttal if petitioner had presented such evidence. The referee found that lead trial attorney O'Sullivan conducted no penalty phase investigation and delegated that task to second counsel Morehead. The latter's other assignments — assisting in selecting a jury, preparing pretrial motions, exploring a mental state defense for the guilt phase, and being the second counsel at the guilt phase — prevented him from doing any work on the penalty phase until after trial began. Both defense attorneys expected the trial court to strike the sole special circumstance allegation — that the murder was for financial gain. Such a ruling by the trial court would have rendered a penalty phase unnecessary. Only much later, on July 17, 1989, when the prosecution rested its case-in-chief at the trial's guilt phase and the trial court denied the defense motion to strike the special circumstance allegation (made in April before the presentation of evidence), did it become apparent to the defense that a penalty phase could not be ruled out. The referee also found that defense investigator Murphy did not begin a penalty phase investigation until early July 1989.

As to our question what evidence damaging to petitioner the prosecution at the trial's penalty phase would likely have presented on rebuttal, the referee found (a) that defense attorney Morehead was concerned that presenting the testimony of mental health experts at the penalty phase would have enabled the prosecution to reinforce to the jury the facts of Nancy's murder; and (b) that prosecution witness Dr. Martell could have testified that petitioner's symptoms of depression,

20

substance abuse, and sexual promiscuity were shared by a substantial majority of the prison population and were as consistent with a diagnosis of antisocial personality disorder as with the defense theory that as a child petitioner was sexually abused by his mother.

### 7. Question No. 7

Our seventh question asked the referee whether petitioner did or said anything that hindered or prevented the defense from investigating and presenting additional mitigating evidence at the penalty phase. The referee found that it was undisputed petitioner did not tell his trial counsel of childhood sexual abuse. But the referee also found no evidence that petitioner had hindered such an investigation or asked that mitigating evidence not be presented.

### 8. Referee's summary

Summarizing the mitigating evidence presented by petitioner at the reference hearing, the referee stated there was abundant credible evidence at the hearing "that petitioner's upbringing was anything but idyllic" and that the evidence "demonstrated that petitioner had a family history fraught with incest, abuse, dysfunction, mental illness and substance abuse."

### III. PETITIONER'S EXCEPTIONS TO THE REFEREE'S REPORT

Petitioner challenges the referee's finding that second counsel Morehead "was concerned that the presentation of mental-health evidence on petitioner's behalf [at the trial's penalty phase] would have led to a reiteration of the facts of the crime." The referee made this finding in response to that part of our question number six asking what evidence the prosecution could have presented on rebuttal if petitioner had presented additional mitigating evidence at the penalty phase. According to petitioner, the finding is not responsive to our inquiry in question number six because the facts of the crime were presented at the guilt phase. The

referee, however, made the same finding in response to reference question number three, which asked what tactical justifications trial counsel had for limiting the presentation of evidence at the penalty phase. Because the referee's finding is responsive to question number three, petitioner's challenge to the finding as to our question number six has no effect on our review of this matter.

Petitioner also takes exception to the referee's finding that prosecution witness "Dr. Martell testified that the petitioner's symptoms were just as consistent with antisocial personality disorder as they were with sexual abuse." Petitioner argues it was undisputed that he could not be diagnosed with having an antisocial personality disorder because he did not satisfy the diagnostic criterion of exhibiting a conduct disorder *before* the age of 15 years. In support, petitioner points to his witness Dr. Morris's testimony on redirect examination by petitioner's attorney at the reference hearing that a diagnosis of antisocial personality disorder requires a finding of a conduct disorder before the age of 15, and that he saw no evidence in the documents he had read that petitioner had a conduct disorder before that age. Earlier, however, on cross-examination by the prosecution, Dr. Morris acknowledged that petitioner's symptoms were consistent with a diagnosis of antisocial personality disorder.

We agree with the referee. Prosecution witness Dr. Martell, who had reviewed the pertinent documentary evidence, including the declaration of petitioner's expert Dr. Morris, and who had heard Dr. Morris's testimony at the reference hearing, testified that in evaluating a defendant in light of a nonsexual murder and a background of depression, womanizing, and substance abuse, the "first thought" is that the person has an antisocial personality. Dr. Martell also reviewed the information relating to petitioner's childhood and adult life; he was never asked whether petitioner had a conduct disorder before he was 15 years old. Given this state of the evidence, we cannot conclude, as petitioner would have us

do, that it was undisputed that he could not be diagnosed with having an antisocial personality disorder.

## IV. ATTORNEY GENERAL'S EXCEPTIONS TO THE REFEREE'S REPORT

### A. Findings of Sexual Abuse

The referee stated she had no reason to doubt the veracity of the mitigating evidence that petitioner presented at the reference hearing, and she "accept[ed] the evidence as valid." As relevant here, that evidence included defense expert Dr. Morris's opinion that petitioner had been sexually abused by his mother. In challenging the referee's findings, the Attorney General argues that five rulings by the referee were erroneous and that those rulings may have affected the referee's findings. We discuss those rulings below.

#### 1. *Denial of Attorney General's motion for psychodiagnostic evaluation*

The Attorney General argues that the referee erred in denying the motion to have an Attorney General mental health expert conduct a psychodiagnostic evaluation of petitioner. We agree. When, as here, a habeas corpus petitioner places in issue his mental condition at the penalty phase of his capital trial and in support presents the testimony of a mental health expert, the prosecution is entitled to have the petitioner examined by its mental health expert. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1190; see § 1054.3; *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 572.)

#### 2. *Denial of Attorney General's motion to call petitioner as a witness*

The Attorney General faults the referee for denying the Attorney General's request to call petitioner as a witness at the reference hearing. We agree.

A petitioner in a habeas corpus proceeding involving a challenge to a judgment based on ineffective assistance of trial counsel in failing to investigate and present certain mitigating evidence at the penalty phase of a capital trial has

23

no right not to be called as a witness. (*In re Scott* (2003) 29 Cal.4th 783, 791, 815.) Nor, contrary to the referee's explanation and petitioner's argument here, would petitioner's testimony have been irrelevant at the reference hearing.

A habeas corpus petitioner must prove sufficient grounds for relief. (*In re Bolden* (2009) 46 Cal.4th 216, 224.) Here, petitioner had the burden of proving his allegations of ineffective assistance of trial counsel at the penalty phase. Questioning of petitioner by the Attorney General at the reference hearing would have been highly probative of petitioner's credibility on the key issue of whether as a child he was sexually abused by his mother and why, during the 17 years from August 5, 1985 (when petitioner was charged) to February 26, 2002 (when in connection with the reference hearing petitioner was interviewed by his expert witness, psychologist Dr. Morris), petitioner made no mention of childhood sexual abuse by his mother. Questioning of petitioner by the Attorney General would have been helpful in determining whether such sexual abuse could have been discovered by trial counsel and, if so, whether the failure to present such evidence at the penalty phase prejudiced petitioner.

### 3. *Limiting Attorney General's cross-examination of petitioner's witness Emily Vander Pauwert*

The Attorney General contends that the referee inappropriately limited the Attorney General's cross-examination of Emily Vander Pauwert. We agree.

Emily Vander Pauwert, petitioner's former girlfriend and a defense witness at petitioner's capital trial when she was known as Emily Bates, later testified on petitioner's behalf at the reference hearing. On direct examination, Vander Pauwert testified to petitioner's drinking habits, his irregular sleep patterns, his relationships with his mother and father, his relationships with other women, and her own contacts with trial counsel. On cross-examination by the Attorney General, Vander Pauwert said that she visited petitioner while he was in jail, and

24

that she wanted to find out whether he had killed Nancy, his wife. The Attorney General then asked Vander Pauwert: "And isn't it true that he gave you two different versions of how his wife died?" When petitioner's counsel objected to this question as being beyond the scope of the reference hearing, the referee asked the Attorney General for a response. The Attorney General replied that the question was relevant to petitioner's character, his moral culpability, and his credibility, noting that Dr. Morris's opinion of childhood sexual abuse by petitioner's mother was based in part on Dr. Morris's assessment of petitioner's veracity. The referee sustained petitioner's objection and rejected the Attorney General's request to make an offer of proof.

We agree with the Attorney General that the referee should have allowed the Attorney General to ask the question at issue, as it was relevant to petitioner's credibility and moral culpability, both of which were at issue at the reference hearing.

4. *Referee's refusal to allow certain questions during Attorney General's direct examination of prosecution psychologist Dr. Martell*

The Attorney General contends the referee erred in denying the Attorney General an opportunity, during direct examination of prosecution psychologist Dr. Martell, to question Dr. Martell on the lack of a causal connection between petitioner's childhood sexual abuse by his mother and his commission of the murder. We disagree.

During the Attorney General's direct examination of Dr. Martell, the Attorney General asked: "[W]e'll assume that [petitioner] was sexually assaulted as he alleges by his mother. Based on the peer-reviewed and validated professional literature that was available to members of your profession in 1989, can you cite the court to any authority that a male who had been sexually abused

25

as petitioner alleges was at a statistically significant higher risk than someone who had not been so sexually assaulted to commit a premeditated and deliberate murder?" Petitioner's counsel objected on the ground that the question asked for irrelevant evidence, adding: "There has been no evidence offered by petitioner regarding the assertion that the abuse evidence that has been presented is connected to the commission of the offense." After briefly conferring with counsel for both parties, the referee sustained the objection to the Attorney General's question to Dr. Martell.

The Attorney General argues the evidentiary ruling was an abuse of the referee's discretion. The Attorney General asserts the question was proper rebuttal evidence to correct any misimpression created by petitioner's presentation at the reference hearing of mitigating evidence that, according to petitioner, his trial counsel should have presented at the penalty phase.

The admission of rebuttal evidence is committed to the sound discretion of the trier of fact, here the referee, whose decision will not be disturbed in the absence of " 'palpable abuse.' " (*People v. Kelly* (1990) 51 Cal.3d 931, 965; *People v. Raley* (1992) 2 Cal.4th 870, 912.) At the reference hearing, petitioner had conceded the very point that the Attorney General sought to elicit through the question posed to prosecution expert Dr. Martell — that no causal relationship existed between petitioner's childhood sexual abuse by his mother and his later murder of Nancy, his wife. Here, the referee's stated ground for sustaining the objection of petitioner's counsel reflects her full understanding of petitioner's concession. Because the evidentiary ruling does not constitute palpable abuse, the referee did not abuse her discretion in sustaining the objection to the Attorney General's question at issue.

26

5. *Referee's refusal to allow certain questions on cross-examination by Attorney General of petitioner's expert witness, Dr. Morris*

The Attorney General argues the referee erred in sustaining petitioner's objections during the Attorney General's cross-examination of petitioner's expert witness, Dr. Morris, concerning petitioner's motivation for killing Nancy, his wife. We disagree.

While cross-examining Dr. Morris, the Attorney General asked whether petitioner's murder of his wife was motivated by greed, and also whether the murder was partially motivated by "the thrill of the kill." The referee sustained petitioner's objections to each question. The Attorney General asserts that the questions were appropriate rebuttal questions. As noted above, an evidentiary ruling on rebuttal evidence is reviewed for abuse of discretion and will not be disturbed unless the abuse is palpable. No abuse of discretion occurred here. Dr. Morris's testimony was not directed to and did not address petitioner's motivation for the murder. The Attorney General's questions at issue were directed at most to a peripheral aspect of Dr. Morris's testimony and opinion.

## B. Referee's Finding That Petitioner Did Not Hinder or Prevent Trial Counsel's Penalty Phase Investigation

The referee found: "It is undisputed that petitioner did not tell his trial counsel that he was the victim of sexual molestation or abuse." The referee further found: "No evidence was presented that petitioner . . . hindered the investigation in any manner or asked that any particular mitigating evidence not be presented." The Attorney General challenges the latter finding, arguing the evidence indicates that petitioner did hinder trial counsel's investigation by failing to disclose to his trial counsel the alleged childhood sexual abuse by his mother and by telling counsel that until the time of his parents' divorce, his childhood had been normal. We agree with the Attorney General.

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." (*Strickland v. Washington* (1984) 466 U.S. 668, 691.) Thus, a defendant can hinder counsel's investigation not only through affirmative statements, but also by remaining silent or failing to disclose pertinent information to counsel. (*In re Andrews* (2002) 28 Cal.4th 1234, 1255.) Whether a defendant's statements or nondisclosures have hindered trial counsel's investigation depends upon the circumstances of each case. (See *In re Lucas* (2004) 33 Cal.4th 682, 729.)

Here, lead trial counsel O'Sullivan, who talked to petitioner daily, asked petitioner about his background, asked petitioner whether there were any problems that O'Sullivan should know about, and explained to petitioner the scope of mitigating evidence by reading to him the applicable Penal Code statutes. According to O'Sullivan, petitioner did not tell him of "anything amiss or awry."

Second counsel Morehead, who was in charge of the trial's penalty phase, explained to petitioner the purpose of the penalty phase and the types of evidence that could be presented. When Morehead asked petitioner about his childhood, petitioner responded that he "had a good life until the time that the mother and the father got divorced, and from then on it spiraled downward." Petitioner never mentioned to either attorney that his mother had sexually abused him as a child, obviously critical information, which did not surface until petitioner's expert Dr. Morris interviewed him for the reference hearing, 17 years after petitioner was charged with his wife's murder and 15 years after his mother's death.

Nothing in petitioner's statements to his trial counsel would have led a reasonable attorney to suspect that petitioner had been the victim of childhood

28

sexual abuse by his mother. Also, in an interview with Dr. Phillips, a psychiatrist retained by the defense, petitioner said he "grew up in a normal home under normal circumstances." Accordingly, we agree with the Attorney General that the referee erred in finding that petitioner had not hindered his trial counsel's investigation.

## V.  BURDEN OF PROOF AND SCOPE OF REVIEW

A petition for a writ of habeas corpus is a collateral attack on a presumptively final judgment; therefore, "the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them" (*People v. Duvall* (1995) 9 Cal.4th 464, 474). By a preponderance of the evidence, the petitioner must establish facts that constitute a basis for relief. (*In re Bolden*, *supra*, 46 Cal.4th at p. 224.) When, as here, this court has ordered an evidentiary hearing, we independently review the referee's resolution of legal issues and of mixed questions of law and fact. (*In re Johnson* (1998) 18 Cal.4th 447, 461.)

Here, petitioner claims that he was denied the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and under article I, section 15 of the California Constitution. (*In re Marquez* (1992) 1 Cal.4th 584, 602.) That right, petitioner contends, was violated because his trial counsel failed to provide effective assistance at the trial's penalty phase.

To prevail on this claim, petitioner must prove " 'that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.' " (*In re Roberts* (2003) 29 Cal.4th 726, 744-745.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) If a

29

claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697; *In re Cox* (2003) 30 Cal.4th 974, 1019-1020.)

Central to petitioner's claim of ineffective assistance of counsel here is his assertion that trial counsel failed to present at the penalty phase mitigating evidence of childhood sexual abuse by his mother. He now argues that defense counsel should have discovered such abuse and presented evidence of it to the jury. We need not decide whether defense counsel's investigation fell below professional norms, because in any event petitioner has not met his burden of showing prejudice. Petitioner has not shown that trial counsel could reasonably have discovered the alleged abuse.

Petitioner had a number of pretrial meetings with defense counsel in which counsel explained what the penalty phase entailed, the type of evidence that could be presented at the penalty phase, and the scope of such evidence. In those meetings, counsel asked petitioner about his social history and background. Petitioner never mentioned childhood sexual abuse by his mother. Instead, petitioner as well as his father told defense counsel that petitioner had had a normal childhood. Petitioner made a similar statement to a defense psychiatrist, Dr. Phillips.

Petitioner first mentioned sexual abuse by his mother when his expert, Dr. Morris, interviewed petitioner for the reference hearing, 17 years after petitioner was charged with his wife's murder and 15 years after his mother's death. His former wife, Patricia Silva, who testified on behalf of petitioner at the reference hearing, said he never told her of being sexually abused by his mother. Emily Vander Pauwert testified at the reference hearing that petitioner had mentioned to her that his mother had been abusive, but that he did not elaborate on

30

whether any such abuse was emotional or physical, much less say that it was sexual in nature. His mother's brother, Eddie Richardson, stated in his deposition presented at the reference hearing that he had no knowledge of such sexual abuse by petitioner's mother, and that such abuse would have been "out of character" for her.

Petitioner's own statements to his expert, psychologist Morris, about his mother's alleged sexual abuse of him cannot be used to establish the truth of those statements. (*People v. Elliot* (2005) 37 Cal.4th 453, 481; *People v. Gardeley* (1996) 14 Cal.4th 605, 619.) Therefore, Dr. Morris's recitations at the reference hearing of petitioner's statements to him regarding the alleged sexual abuse do not constitute proof that such abuse actually occurred. Accordingly, at the reference hearing petitioner failed to produce direct evidence that he was the victim of maternal sexual abuse.

Petitioner asserts that at the reference hearing he did present evidence that his trial counsel could have learned of the maternal sexual abuse if counsel had hired a reasonably competent mental health professional to evaluate petitioner. Petitioner did indeed present such evidence at the reference hearing. Petitioner's expert, Dr. Morris, testified that petitioner's symptoms of depression, substance abuse, sleep disorders, and compulsive sexual behavior, when viewed with statements that his mother had been sexually molested, "would have constituted red flags warranting investigation as to whether or not [petitioner] himself had been the victim of sexual abuse," and that "any reasonably competent mental health professional" would have inquired into whether petitioner was a victim of such abuse. To a lesser degree this view was supported by psychiatrist Dr. Phillips, who testified on petitioner's behalf at the reference hearing that if he had known of petitioner's history one of his conclusions, but not necessarily the most likely one, would have been that petitioner had been sexually abused.

31

Dr. Martell, the prosecution's expert, disagreed with petitioner's expert, Dr. Morris. Dr. Martell testified that petitioner's symptoms were not specific to sexual abuse and were consistent with a diagnosis of antisocial personality disorder, a diagnosis common in the prison population. Thus, in Dr. Martell's opinion a reasonably competent mental health professional would not have been alerted to the need to inquire into the possibility of maternal sexual abuse. As Dr. Martell explained, maternal sexual abuse is so rare that it is not a matter that would generally be the subject of professional inquiry, the professional literature on the subject is very limited, and the historical evidence of men in petitioner's family taking advantage of women would lead a mental health professional to conclude that petitioner too took advantage of women, but not to conclude that as a child petitioner had been sexually abused by his mother.

The competing views of the mental health experts have persuasive force, but we need not decide which of those views to accept. Even if we assume that at the time of petitioner's trial a reasonably competent mental health professional would have inquired into whether petitioner had been sexually abused by his mother, petitioner has not carried his burden of establishing that evidence of such abuse would have actually been discovered. As discussed earlier, petitioner never told his trial counsel of being sexually abused by his mother. Petitioner's first and only mention of such abuse occurred 17 years after his arrest for the murder of his wife, when his expert, Dr. Morris, interviewed him in preparation for the reference hearing. Because petitioner has not shown that further investigation by defense counsel would have revealed evidence of maternal sexual abuse, he has not established prejudice from the absence of any additional investigation.

We now turn to the remaining mitigating evidence that petitioner presented at the reference hearing and that he asserted his trial counsel should have presented at the penalty phase. As previously explained, the referee found that

petitioner presented credible evidence that his "upbringing was anything but idyllic" and that he had "a family history fraught with incest, abuse, dysfunction, mental illness and substance abuse." Petitioner argues that his trial counsel's failure to discover and present this evidence at the penalty phase of his capital trial violated his constitutional right to competent counsel. As we explain below, we need not decide whether reasonably competent counsel would have discovered and presented this evidence, because petitioner was not prejudiced by trial counsel's failure to do so.

Petitioner presented a substantial array of evidence at the reference hearing concerning his family history. But family background "is of no consequence in and of itself." (*People v. Rowland* (1992) 4 Cal.4th 238, 279.) Rather, it "is material if, and to the extent that, it relates to the background of defendant himself." (*Ibid*.) Here, much of the family background evidence presented at the reference hearing was not connected to petitioner. For example, although petitioner presented evidence that his grandfather sexually abused his own children, including petitioner's mother, there is no evidence that petitioner was aware of this abuse until after his capital trial. Similarly, although petitioner offered evidence that his father and uncle sexually molested girls in the family, petitioner has failed to show he was aware of such molestation at the time of his capital trial.

True, some of the family history evidence at the reference hearing *did* relate to petitioner's own background. Petitioner presented evidence that his mother was cold and aloof; that petitioner, his father, and his older brother had substance abuse problems; that petitioner, his mother, and his father suffered from depression; that petitioner's grandfather exposed him to an "oversexualized environment" and encouraged sexual activities; and that petitioner's older brother and friends of his brother exposed him to drinking, drugs, and sexual activities.

33

But no evidence was presented that petitioner suffered the deprivations of an impoverished upbringing or that he was ever subjected to violence or physical abuse.

To decide whether petitioner was prejudiced by his trial counsel's failure to discover and present the evidence described in the preceding paragraph, we must determine whether that evidence, when considered in light of the aggravating and mitigating evidence presented at the penalty phase of petitioner's capital trial, is of such significance that it undermines our confidence in the outcome of the penalty phase of that trial. (*In re Lucas*, *supra*, 33 Cal.4th at p. 733.) We conclude that petitioner was not prejudiced.

The mitigating evidence petitioner presented at the reference hearing of his dysfunctional family might have elicited some jury sympathy for him at the penalty phase of his capital trial. But petitioner showed no causal connection between his family environment and his cold-blooded and calculated decision to brutally murder his wife, Nancy, a few months after they were married, for the sole purpose of obtaining her money and possessions. Even if petitioner's upbringing was not ideal, it was not so horrible as to leave him incapable of functioning as a law-abiding member of society. Penalty phase evidence presented by the defense showed that he had had good relationships with women, and that he had served in the military without incident and had been honorably discharged. Petitioner was not an immature youth when he killed his wife; he was in his late 20's. For these reasons, we find no reasonable probability that, but for trial counsel's alleged failings, the result of the penalty phase would have been different. (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

## DISPOSITION

Petitioner has not established that he is entitled to habeas corpus relief on his claim that his trial counsel was ineffective for not investigating and presenting

certain mitigating evidence at the penalty phase of his capital trial.  Because our order to show cause and our reference order were limited to this claim, we do not here address any other claim set forth in the petition, which will be resolved by separate order.  (*In re Bolden*, *supra*, 46 Cal.4th at p. 230.)

The order to show cause is discharged.[2]


KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
CHAVEZ, J.*

---

[2]     Petitioner's request (presented as an argument in his brief on the merits) that we remand the matter to the referee with directions that the referee order disclosure of the communication made by another judge to Judge Brian C. Walsh, who recused himself after being appointed referee, is deemed to be a motion for such disclosure, and as such is denied.

*     Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Crew

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S107856
**Date Filed:** July 11, 2011

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, Andrew S. Love, Assistant State Public Defender, and Evan Young, Deputy State Public Defender, for Petitioner Mark Christopher Crew.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald A. Bass, Gerald A. Engler and Ronald S. Matthias, Assistant Attorneys General, Peggy S. Ruffra, Alice Lustre and Glenn R. Pruden, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew S. Love
Assistant State Public Defender
221 Main Street, Tenth Floor
San Francisco, CA  94105
(415) 904-5600

Glenn R. Pruden
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5959