Filed 12/8/20  P. v. Blake CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>KENYATA BLAKE,<br><br>      Defendant and Appellant. | B298188<br>(Los Angeles County<br> Super. Ct. No. BA433216) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed as Modified.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Kenyata Blake appeals from a judgment of conviction after a jury convicted him of one count of first degree felony murder (Pen. Code, § 187, subd. (a)),[1] two counts of robbery (§ 211), and found true that defendant personally used a deadly and dangerous weapon during the murder (§ 12022, subd. (b)(1)), the commission of which occurred during a robbery (§ 190.2, subd. (a)(17)). The trial court sentenced defendant to an overall term of life imprisonment without the possibility of parole (LWOP) plus four years, and imposed a $300 restitution fine, three $40 court operations assessments, and three $30 court facilities assessments.

On appeal, defendant contends insufficient evidence supports a finding that he participated in the robbery as alleged in count 3. He also challenges the constitutionality of the eyewitness identification instruction (CALCRIM No. 315) given at trial, the robbery-murder special circumstance found true in count 1, and the mandatory LWOP sentence he received for the special circumstance murder that he committed while he was 18 years 7 months old. Finally, defendant contends his trial counsel rendered ineffective assistance of counsel by failing to object to the imposition of the restitution fine and assessments before conducting an ability to pay hearing.

The Attorney General disputes these contentions, and notes that the indeterminate and determinate abstracts of judgment should be

---

[1]     Unspecified references to statutes are to the Penal Code.

corrected to accurately reflect the court's oral pronouncement of judgment.

We agree, and modify the abstracts of judgment to reflect the court's verbal pronouncement. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

By information, defendant and his identical twin brother Keishon Blake were charged with the first degree felony murder and robbery of Maria Rivas (§§ 187, subd. (a), 211; counts 1 & 2), and the robbery of Yoshie Washington (§ 211; count 3).[2] The information also alleged that the murder of Rivas was committed during the commission of a robbery (§ 190.2, subd. (a)(17)), and that defendant personally used a deadly and dangerous weapon, a knife, during the commission of the murder (§ 12022, subd. (b)(1)).

Following court ordered treatment to restore his competency to stand trial (§ 1368), in April 2019, when defendant was 22 years old, he was tried alone before a jury.

1. *Prosecution Evidence*

A. *Robbery and Murder of Maria Rivas*

According to Detective Robert Lait, the investigating officer assigned to this case, around 6:30 p.m. on December 22, 2014, paramedics were called to a sidewalk area outside of a Ralph's grocery

---

[2] For ease of reading, we refer to Keishon Blake by his first name. Keishon is not a party to this appeal.

store to assist a woman who had been stabbed. Maria Rivas, a 62 year-old woman, was transported to a hospital where she subsequently died. When Lait arrived at the scene, he saw a bag of groceries on the sidewalk. Lait did not locate a purse, wallet, or other identifying information of Rivas.

A deputy medical examiner testified that Rivas died from a single stab wound to the left side of her upper back that penetrated her left lung and heart. No defensive marks were found on her body.

Lait obtained security video from the Ralph's grocery store. As the prosecutor played clips of surveillance footage, Lait testified that the woman depicted on the video was Rivas. The surveillance footage showed Rivas carrying a large black purse inside the store. Prior to exiting the store around 6:10 p.m., Rivas purchased the groceries that Lait had found at the scene of the stabbing.

Defendant's adopted sister, Gail Turner,[3] testified that on the evening Rivas was stabbed, defendant and Keishon ran home to where they and Turner lived to watch the news. When Turner confronted defendant the following day about the stabbing, he became angry and responded that "the lady wasn't nothing but a Mexican and—a Mexican and they [*sic*] always killing us, so fuck her." Defendant then told Turner he had stabbed Rivas with a knife.

---

[3] Turner's mother adopted defendant and Keishon when they were four years old.

B. *Robbery of Yoshie Washington*

Around 6:30 p.m. on January 23, 2015 (one month after the robbery and murder of Rivas), Yoshie Washington was walking alone on a sidewalk in front of an apartment building. She testified that while she was walking and talking on her cell phone, she was forcefully pushed from behind, causing her to drop her phone and fall to the ground, scraping her knee.

Washington watched as a "Black . . . but light-skinned" man ran from behind her and picked up her cell phone before running across the street. Washington did not see the man's face. Suddenly, another light-skinned Black man walked in front of Washington, who was still on the ground, and said, "Give me your shit." Washington looked at the man's face and threw away her purse. The man picked up the purse, which contained her wallet, house and car keys, and walked across the street toward the other suspect "as if nothing had happened." Washington watched as both men, who "looked very similar to each other," walked away together. Washington recalled her white Nissan Rogue was parked nearby and could be located by pressing the car key. Washington ran to her friend's apartment and called the police.

Around 6:40 p.m., Officer Joshua McDonald responded and met with Washington at the apartment. Though Washington told McDonald that she could only identify one of the suspects, she told McDonald that both suspects were light-skinned Black men between the ages of 18 and 20.

Around 8:00 a.m. the next morning, Washington walked to where her car had been parked and discovered that it had been stolen.

5

Washington's child car seat and toys, which had been inside the car when Washington last locked it, were on the ground. The same day, Washington went to the police station to report that her car had been stolen.

C.    *Defendant's Arrest and Subsequent Investigation*

Turner testified that sometime around 9:00 or 10:00 p.m. in January 2015, she saw a white car "[f]acing the wrong way in front of the house, and then a young lady drove it up into the driveway."[4] Turner watched as Keishon and his female companion removed license plates from the car. When Turner talked to Keishon, he did not mention defendant, and stated that that his female companion was with him during the robbery of Washington.

A patrol officer testified that around 5:00 p.m. on January 25, 2015, she and her partner noticed an abandoned, white Nissan Rogue parked on the wrong side of the street. When the officers ran the license plates affixed to the car, they determined that the plates did not match. After running the vehicle identification number, the officers realized the car had been reported stolen. When the car was impounded, a forensic print specialist pulled a fingerprint from the outside passenger side, rear body panel of the car near the gas tank. The fingerprint conclusively matched defendant's fingerprint.

---

[4]    Turner subsequently testified that she did not "know who drove up in the car, I just know when they got out of it. When they were at the door, in the house, the car was sitting out in front."

On January 26, 2015, Turner called the police and spoke with Lait about the murder and robberies. Turner's description of the stabbing was consistent with autopsy findings. According to Lait, both robberies took place in the same part of Los Angeles.

Following Turner's discussions with Lait, defendant and Keishon were arrested, after which defendant admitted to stabbing Rivas. Defendant told Lait he had stabbed Rivas because she struggled with defendant over her purse.

Lait met with Washington and showed her two photographic six-pack lineups. In the first lineup that included a photograph of Keishon,[5] Washington identified Keishon as the person who had demanded her belongings. When Washington was shown the second lineup that included a photograph of defendant, she looked puzzled, pointed to defendant's picture, and told Lait, "Well, it's the same person." When Lait told Washington that defendant and Keishon were identical twins, Washington said she saw only one of the assailant's faces, and that the assailant could have been either defendant or Keishon. Lait testified that "although [Washington] circled the first one [identifying Keishon] . . . she couldn't say with any more certainty that it wasn't the second one that I showed her as well."

During her testimony, Washington recalled telling Lait that she "could not I.D. the other person" who had taken her cell phone. The person she was "attempting to I.D., was . . . the person who said 'give

---

[5]     Lait decided to use Keishon's picture in the first photographic lineup after Turner told him that Keishon had admitted to participating in the robbery.

me your shit.'" Despite her inability to identify the suspect who had taken her cell phone, Washington reiterated at trial that both suspects were similar in size, age, race, and skin tone.

2.     *Defense Evidence*

Defendant did not present any witnesses in his defense.

3.     *Verdict and Sentencing*

The jury found defendant guilty as charged, and found the special allegations to be true. The court sentenced defendant to an overall term of imprisonment for life without the possibility of parole in count 1, plus a consecutive determinate term of four years, comprised one year for the deadly weapon enhancement in count 1, plus the middle term of three years in count 3. The court then ordered defendant to pay a $300 restitution fine (§ 1202.4, subd. (b)), three $40 court operations assessments (§ 1465.8), and three $30 court facilities assessments (Gov. Code, § 70373). Defendant filed a timely notice of appeal.

## DISCUSSION

1.     *Sufficient Evidence Supports the Robbery Verdict in Count 3*

Defendant contends that insufficient evidence supports a finding that he participated in the robbery of Washington in count 3. We disagree.

8

A.    *Governing Law and the Standard of Review*

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt."  (*People v. Vargas* (2020) 9 Cal.5th 793, 820 (*Vargas*).)  "'"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence."'  [Citation.]" (*Ibid.*)

During our review, we presume every fact the jury could have reasonably deduced from the evidence, and accept logical inferences that the jury might have drawn from the circumstantial evidence, even if the evidence can be reconciled with a contrary finding.  (*Vargas*, *supra*, 9 Cal.5th at p. 820; *People v. Flores* (2020) 9 Cal.5th 371, 411; *People v. Taylor* (2004) 119 Cal.App.4th 628, 639 ["the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal"].)

B.    *Analysis*

Defendant contends there was insufficient evidence that he was one of the two men who participated in the robbery of Washington.  He asserts Washington's description of the assailants was too generic and did not amount to substantial evidence because "[a] mere racial match,

without more, is not of evidentiary value." (*In re Christopher B.* (2007) 156 Cal.App.4th 1557, 1560, fn. 2.)

Defendant's claim ignores the full range of circumstantial evidence that the jury actually considered. (See *People v. Stanley* (1995) 10 Cal.4th 764, 792–793 [circumstantial evidence may connect a defendant with the crime].) That evidence included Washington's identification of Keishon as one assailant—an identification defendant does not dispute—and her full description of the other assailant. Washington told Lait and testified at trial that both assailants were skinny, light-skinned Black men between the ages of 18 and 20 years. She also stated that both assailants looked "very similar to each other," which is compelling given that Keishon and defendant are identical twins.

Defendant's argument also ignores the jury's consideration of the similarities with which the Rivas and Washington robberies were committed. (See *Vargas, supra*, 9 Cal.5th at p. 824 [evidence of the offense "was similar to the evidence adduced concerning each of the robberies with which defendant was charged"]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 564 [same].) In each robbery, an unaccompanied woman carrying a purse was suddenly attacked by Keishon and another young man (who was indisputably identified in the first robbery as defendant). Both women were robbed in the same part of the city, around the same time, and were in vulnerable positions.

The physical evidence also connects defendant to the scene of the robbery. On January 24, the morning after the robbery, Washington found her child's seat and toys strewn on the street where her locked

10

car had been parked. The car was reported stolen the same day, and was recovered by police on January 25, after which investigators located defendant's fingerprint on the outside rear passenger side of the car. From this evidence, the jury could reasonably infer that defendant and Keishon obtained Washington's car key from her purse, and used it to locate and ransack the car before driving away. Thus, we cannot say that the jury lacked sufficient evidence to find that defendant took Washington's belongings from her person and against her will by means of force or fear (§ 211).

2. *The Eyewitness Identification Instruction (CALCRIM No. 315) Is Not Unconstitutional*

Defendant contends that the trial court violated his federal constitutional rights by instructing the jury, as part of CALCRIM No. 315, that in evaluating the accuracy of an identification, it could consider the level of certainty with which an eyewitness (i.e. Washington) made the identification. Defendant contends that the jury should not be permitted to consider this as a factor, because scientific studies and case law recognize there is, "at best, a weak correlation between witness certainty and the accuracy of an identification."

As delivered to the jury in this case, CALCRIM No. 315 provides:

"You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well

11

could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe . . . ? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] *How certain was the witness when he or she made an identification?* [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Italics added.)

Defendant acknowledges that he did not object to this instruction at trial; however, he contends that his claim was not forfeited because the instruction affected his substantial rights. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 927 (*Anderson*) ["[f]ailure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights"].)

Defendant has not established how consideration of a witness's certainty affected his substantial rights. (*Anderson, supra,* 152

12

Cal.App.4th at p. 927 [determination depends on whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)].) On the contrary, given the facts of this case, defendant would surely want the jury to consider how *uncertain* Washington's identifications were, as CALCRIM No. 315 permits the jury to do. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*).) Indeed, during closing argument, defense counsel drew the jury's attention to Washington's inability to identify defendant, and the uncertainty with which she described the second assailant.[6] Thus, "it is unclear that defendant would want the court to delete the certainty or uncertainty factor from the instructions." (*Id.* at p. 462.)

The contention is meritless in any event. In *Sánchez*, our Supreme Court "specifically approved" CALCRIM No. 315's predecessor, CALJIC No. 2.92, "including its certainty factor," which had previously been approved in *People v. Wright* (1988) 45 Cal.3d 1126, and "reiterated the propriety of including this factor" in the jury instruction. (*Sánchez*, *supra*, 63 Cal.4th at p. 462.) After acknowledging the very same premise on which defendant relies here (i.e., that out-of-state cases had found "scientific studies that conclude there is, at best, a weak correlation between [eye]witness certainty and accuracy"), the

---

[6] Counsel told the jury that Washington "couldn't tell what race my client was, if he was there. She couldn't tell what race the other assailant was, or whether it was female or male, because she didn't see them." Counsel also stated that "[Washington] told the police officer she had no idea, could not tell who the other person was. Do you remember both of them? No, only one. Was that person tall? Fat? Black? White? Skinny? No, I have no idea."

13

Court declined to reexamine its previous cases, explaining that because some certain and uncertain identifications had been made at trial, it was "not clear that even those [out-of-state] cases would prohibit telling the jury it may consider this factor" in a case where the defendant "would surely want the jury to consider how *uncertain* some of the identifications were." (*Id.* at pp. 461–462; see *id.* at p. 462 ["[a]ny reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications"].)

Like *Sánchez*, this case does not involve certain identifications. Regardless, we are bound by our high court's decisions on this issue, and conclude that the instruction is not unconstitutional. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).)[7]

3.    *The Felony-Murder Special Circumstance Is Not Unconstitutional*

Defendant's conviction for first degree felony murder in count 1 included a true finding that he killed Rivas during the commission of a robbery. "Once the jury finds the defendant has committed first degree murder, the felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a

---

[7]    We are also bound by the decisions of the United States Supreme Court, which have approved consideration of a witness's certainty when evaluating the witness's "'ability to make an accurate identification.'" (See *Perry v. New Hampshire* (2012) 565 U.S. 228, 725, fn. 5, quoting *Manson v. Brathwaite* (1977) 432 U.S. 98, 114.)

14

statutorily enumerated felony, and subjects the defendant to a sentence of death or of life without the possibility of parole." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80; see § 190.2, subd. (a)(17)(A) [robbery is an enumerated felony].)

Defendant contends that the robbery-murder special circumstance is unconstitutional because it allows a defendant who is the actual killer to be eligible for the death penalty even if the jury does not find the defendant had a culpable mental state. He also contends that the special circumstance does not narrow the class of offenders eligible for capital punishment, as a direct perpetrator would be subject to both a felony murder conviction and special circumstance finding.

These arguments have been rejected by our Supreme Court. "We have repeatedly held that when the defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of the felony-murder special circumstance. [Citations.] '[W]e have also rejected the related claim that the imposition of the death penalty under these circumstances fails to adequately narrow the class of death-eligible offenders.' [Citations.] We decline to revisit these precedents here." (*People v. Jackson* (2016) 1 Cal.5th 269, 347; accord, *People v. Miles* (2020) 9 Cal.5th 513, 583 [Court again "decline[d] to revisit" the issues identified in *Jackson*].) As a court exercising inferior jurisdiction, we must follow these decisions. (*Auto Equity Sales, supra*, 57 Cal.2d at p. 455.)

4. *Defendant's Life Without the Possibility of Parole Sentence Is Not Unconstitutional*

Defendant contends that his mandatory LWOP sentence for committing a special circumstance first degree murder (§ 190.2, subd. (a)), violates the state and federal constitutions' bans on cruel and unusual punishment, because he was 18 years 7 months old when he committed the murder. He asserts that the characteristics of juveniles that motivated the decision in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), compel a requirement that trial courts exercise discretion to impose a sentence other than LWOP after consideration of these characteristics and any mitigating circumstances.

Defense counsel raised this issue during the sentencing hearing, and the court denied the claim, stating that "defendant's youth, to me, is no excuse." Following a brief outburst from defendant, the court stated that "[i]f I had the authority to choose a different sentence . . . I wouldn't. He deserves the maximum sentence because of what he has done."

In *Miller*, the United States Supreme Court acknowledged that "children are constitutionally different from adults for purposes of sentencing," because juveniles have diminished capacity and greater prospects for reform than adults. (*Miller*, *supra*, 567 U.S. at p. 471.) "[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Id.* at p. 472.) In light of those characteristics, "the Eighth Amendment forbids a sentencing

16

scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Id.* at p. 479.)

As relevant here, however, the United States Supreme Court has consistently toed the line between the age of minority and the age of majority when determining the constitutionality of capital punishment: "While drawing the line at 18 is subject to the objections always raised against categorical rules, that is the point where society draws the line for many purposes between childhood and adulthood and the age at which the line for death eligibility ought to rest." (*Roper v. Simmons* (2005) 543 U.S. 551, 554 (*Roper*); accord, *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380 (*Gutierrez*).)

We are bound by *Miller*, *Roper*, and *Gutierrez*, and decline the invitation to conclude that "new insights and societal understandings about the juvenile brain require us to conclude the bright line of 18 years old in the criminal sentencing context is unconstitutional." (*People v. Perez* (2016) 3 Cal.App.5th 612, 617; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220–1221.)

5.    *Restitution Fine and Assessments*

As discussed above, the trial court imposed a $300 restitution fee (§ 1202.4, subd. (b)), three $40 court operations assessments (§ 1465.8), and three $30 court facilities assessments (Gov. Code, § 70373). Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*),

17

defendant now challenges the assessments and fine on due process grounds.[8]

Defendant concedes he did not object to the imposition of the assessments or restitution fine despite being sentenced five months after *Dueñas* was decided. To avoid forfeiting the claim (see *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155), defendant contends that his counsel's failure to object to the imposition of the fine and assessments constituted ineffective assistance of counsel.

To establish ineffective assistance of counsel, defendant was required to demonstrate prejudice, or a reasonable probability that but for the challenged act or omission of counsel, he would have obtained a more favorable result. (*People v. Centeno* (2014) 60 Cal.4th 659, 674–676; see also *In re Crew* (2011) 52 Cal.4th 126, 150 ["[i]f a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient"].)

Defendant has not established that he was prejudiced by counsel's failure to object. Without any citation in the record, he simply concludes that he was then and is now indigent. In our review of the record, we find no indication that defendant was indigent or otherwise

---

[8] Our Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, on the following issues: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?"

unable to pay the restitution fine and assessments. The minute orders and abstract of judgment reflect that defendant was represented by private counsel at trial. The pre-conviction probation report lists as "unknown" defendant's employment, residency, mental health, parenthood, and finances. Moreover, the court could have found that defendant was able to pay the total sum of $510 from prison wages over the length of his lifetime sentence. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1075–1077 [any *Dueñas* error was harmless due to defendant's ability to earn prison wages equaling amount of fine and assessments]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 [same]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 [same].) Having failed to satisfy his burden to establish prejudice, defendant's *Dueñas* claim fails.

6. *Correction to the Abstracts of Judgment*

At the sentencing hearing, the trial court imposed three consecutive sentences: an LWOP sentence for first degree felony murder (count 1); a one-year sentence for the deadly weapon enhancement (count 1); and a three-year sentence for the Washington robbery (count 3).

The Attorney General correctly notes that the consecutive three-year sentence in count 3 is listed in the indeterminate abstract of judgment as a consecutive LWOP sentence, and is omitted from the determinate abstract of judgment. The Attorney General is also correct that the consecutive one-year sentence for the deadly weapon

19

enhancement on count is omitted from the indeterminate abstract of judgment.

We direct preparation of amended abstracts of judgment to correct these errors. (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

## DISPOSITION

The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation amended abstracts of judgment that reflect: (1) the three-year determinate sentence in count 3 is to run consecutively to the LWOP sentence in count 1; and (2) the one-year sentence for the deadly weapon enhancement in count 1 is to run consecutively to the LWOP sentence. As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

COLLINS, J.

CURREY J.